**STATE**

v.

**Walter FETZIK.**

No. 89–18–C.A.

Supreme Court of Rhode Island.

July 13, 1990.

James E. O'Neil, Atty. Gen., Jane McSoley, Sp. Asst. Atty. Gen., Jeffrey Greer, Asst. Atty. Gen., for plaintiff.

Richard Casparian, Public Defender, Barbara Hurst and Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on the defendant's appeal from his conviction in Superior Court of murder in the second degree. He was sentenced to life imprisonment at the Adult Correctional Institutions. We sustain the defendant's appeal, vacate the judgment of conviction, and remand the case for a new trial. The facts of the case insofar as pertinent to this appeal are as follows:

On September 22, 1984, Woonsocket police responded to a shooting at 164 Front Street, a multi-family apartment building in the city. Upon arrival Detective Omer Frappier was greeted by Shirley Fetzik, the wife of defendant, who told him that her husband had just shot someone in their apartment. The detective testified that when he entered the building, he found the victim, John Almeida, lying in the hallway near the threshold into the first-floor apartment. The detective testified that the victim had been shot in the face.

Shirley Holmberg, who was also a resident of the apartment house, testified that about two weeks prior to the shooting Almeida had come to her apartment demanding to see people who had moved away. She told him that the people no longer lived there but he refused to leave, persisting for approximately ten to fifteen minutes. Holmberg testified that after Almeida left, she was still frightened and went to discuss the incident with defendant. She told police that defendant had assured her that if Almeida came around again, he would "blow his * * * head off."

Tony Martinez, who also lived in the building, testified that when Almeida visited the building on that date, he and defendant were sitting on the second-floor porch. The defendant saw Almeida in the parking lot and asked Martinez who he was. Martinez then stated that Almeida yelled up to them asking at one point if defendant wanted "a knuckle sandwich." Martinez said that defendant then asked "what was wrong with the guy," referring to Almeida. Almeida left shortly after that.

At trial Holmberg testified that on the day of the shooting she was at home with a friend, Deborah Rossi. From her kitchen window, she saw Almeida coming up the driveway accompanied by Roland Ethier whom she knew as Shorty. She then ran across the hall to defendant's apartment and told him "that the man who was here two weeks ago looking for trouble, was around again."

Deborah Rossi testified that while Holmberg was in defendant's apartment, Almeida banged on Holmberg's door. Almeida stated that he was looking for Holmberg's boyfriend, David Spearman. Rossi told him that Spearman was not there. She stated that Holmberg came out of the Fet-

zik apartment and pointed to Almeida stating, "That's the guy." Holmberg then returned to her own apartment. Rossi stated that defendant then asked Almeida, "Are you the guy that wanted to give me a knuckle sandwich?" She testified that Almeida then started walking toward defendant's apartment.

Shirley Fetzik testified that when Almeida entered the apartment her husband warned him, "I'm going to get my shotgun" and "If you don't leave, I'll get my gun."[1] While Almeida was in the apartment defendant did go to the living room and did obtain his gun. When defendant returned to the kitchen he initially pointed the shotgun at the ceiling.

Apparently Almeida did not heed defendant's warnings and kept moving further into the kitchen. Karen Phillips, a guest in the Fetzik apartment, testified that defendant again demanded that Almeida leave but that, instead, Almeida opened his jacket and reached to grab a knife. The defendant, who did not testify, told police before trial that just before the gun went off, Almeida sort of lunged and reached for his pocket. The defendant said he thought that Almeida was grabbing his weapon.

The testimony of "Shorty" Ethier, who had accompanied Almeida to the house, differed significantly from that given by other witnesses at trial. He stated that defendant taunted Almeida, saying, "Well, you want to put your fist in my face, come on, try it now," whereupon Almeida stepped three feet into defendant's kitchen. When defendant retrieved the shotgun, Ethier then told Almeida he wanted to leave. He stated that defendant told Almeida, "If you're going to put a fist in my face, I'll blow your * * * head off." As Almeida walked into the apartment, Ethier saw him reach for his knife. Ethier stated that he said, "No, John" and Almeida removed his hand from his knife before defendant fired his gun.

Martinez, who was also present at the shooting, testified that just before the gun

went off, he pushed Karen Phillips to the floor. After the gun went off, he testified that defendant stated, "Oh, my God, what happened?" The defendant then left the apartment and later turned himself in to the Woonsocket police.

The medical examiner also testified. She stated that Almeida died of the gunshot wound. Years before the incident, Almeida was in a serious car accident. She stated that because of this accident, he suffered from a condition that could cause personality and behavioral problems. She stated that a person with that condition could be easily agitated, uncommonly aggressive and impulsive.

On May 5, 1988, a jury returned a verdict of guilty of second-degree murder.

■ On appeal defendant claims that the trial justice erred in refusing to instruct the jurors that defendant's physical condition was a relevant consideration in the determination of whether he had reasonably defended himself. The request for this instruction, which was delivered to the court and the prosecution shortly before the jury was charged, read as follows:

"DEFENDANT'S SUPPLEMENTAL REQUEST FOR INSTRUCTIONS

In determining whether the degree of force used by Walter Fetzik was reasonable under all the circumstances to prevent an impending injury, a relevant factor in determining the reasonableness of Mr. Fetzik's use of force is his personal physical ability to act."

The trial justice declined to give this instruction, giving as his reasons that the request was not timely under the Rules of Criminal Procedure for the Superior Court and that the evidence did not justify defendant's request for supplemental instruction. Rule 30 of the Superior Court Rules of Criminal Procedure requires that when a defendant relies upon an affirmative defense or justification or a matter in mitigation he or she must advise the court no later than the close of evidence. The basic

---

**1.** Several witnesses at trial corroborated the fact that defendant had told the victim to get out of the apartment several times.

reason for the rule is to afford the trial justice adequate opportunity to consider the instructions as a whole, the requests of both the defendant and the prosecution and to incorporate those that are warranted into the general jury instruction. In the case before us both the state and the defense had submitted numerous requests for instructions on May 2, 1988, within the time provided by Rule 30. The request in question was the only request not filed in a timely manner and was filed the next day before the trial justice arrived at the courthouse.

Although the instruction was technically late, the trial justice appears to have had an adequate opportunity to consider this instruction. The requested instruction was one that could easily have been included with those that were given. Because defense counsels' tardy filing of the particular instruction request was not reflective of their otherwise diligent efforts in the trial, it would appear that the trial justice may have abused his discretion when he refused to consider the request on the ground of lateness. The time limit was intended to promote the orderly conduct of a trial. It was never intended to be an unalterable condition in the face of an otherwise meritorious request for an instruction that was of considerable importance to a defendant.

A review of the record also indicates that defendant presented extensive testimony that documented his physical disabilities and supported this requested supplemental instruction. The evidence established that defendant suffered from the effects of chronic gouty arthritis.[2] This condition, his physician testified, grossly interfered with defendant's ability to perform physical acts such as walking or running. The physician testified that defendant could not wrestle a person to the ground, kick anyone, or throw a punch. Shirley Fetzik buttressed the testimony of the doctor when she testified at trial that defendant could neither run nor walk fast. She also testified that defendant had been bedridden, confined

previously to a wheelchair and had been hospitalized several times.

We have said that when there is evidence in support of any defense offered by a defendant that raises an issue of fact favorable to him, the court should present the issue by an affirmative instruction that fully and fairly declares the applicable law. *State v. D'Amario*, 568 A.2d 1383 (R.I. 1990). It is our opinion that defendant presented sufficient evidence that warranted an instruction concerning his physical condition.

This failure to give the requested instruction appears to have prejudiced defendant. The law of self-defense in this State recognizes that whether one used reasonable force can only be determined by consideration of the particular circumstance of each case. We have stated:

"[O]ne may defend oneself whenever one reasonably believes that he or she is in imminent danger of bodily harm at the hands of another. Such a person, having the fear, need not wait for the other to strike the first blow. However, such a person must use only such force as is reasonably necessary for his own protection. *The permissible degree of force used in defense of oneself varies with the particular set of circumstances in which he or she acts * * *.* It is clear then that the 'very essence of the defense of self defense is how the defendant perceived the situation at the time of the incident in question.'" (Emphasis added.) *State v. D'Amario*, 568 A.2d at 1385 (quoting *State v. Tribble*, 428 A.2d 1079, 1085 (R.I.1981)).

This court has recognized that when determining whether an accused's actions were lawful, consideration of factors such as defendant's physical condition may in some cases be appropriate. In the case of *In re Paul F.*, 543 A.2d 255 (R.I.1988), the respondent appealed from a judgment of the Family Court that he was wayward because he had committed malicious damage to an automobile. In that case a for-

---

**2.** This condition is manifested by a high level of uric acid that collects in major joints such as the ankles and knees and interferes with their use.

mer boyfriend of the respondent's mother kicked in the door of the family dwelling and invaded the home. In the course of attempting to restrain the former boyfriend from fleeing the scene before police arrived, the respondent broke the windows on his automobile. The trial justice concluded that in so doing, the respondent went beyond the use of reasonable force. On appeal we reversed. We held that the reasonableness of the respondent's actions must be considered in light of the conditions and circumstances as they existed on that day. Among the circumstances considered by this court was the respondent's physical condition and the fact that he was only seventeen years old.

Similarly in the case now before us the trier of fact must determine the reasonableness of defendant's conduct by reviewing all the relevant factors and circumstances. This should certainly include consideration of defendant's debilitating physical condition. Given defendant's physical disabilities, the requested supplemental instruction was entirely appropriate and should have been given to the jury. Therefore, we must reverse defendant's conviction and remand this case to the Superior Court for a new trial.

Although our resolution of this issue is dispositive, we will consider other issues raised on appeal because of the probability that these questions may arise at retrial.

■ The first concerns whether the trial court erred in failing to charge the jury that a person attacked in his own home has no duty to retreat from his assailant. The law concerning self-defense permits persons who believe that they are in imminent peril of bodily harm to use such nondeadly force as is reasonably necessary in the circumstance to protect themselves. *State v. Quarles*, 504 A.2d 473 (R.I.1986). Before resorting to the use of deadly force, the person attacked must attempt retreat if he or she is consciously aware of an open, safe, and available avenue of escape. *State v. Guillemet*, 430 A.2d 1066, 1069 (R.I.1981). By statute an owner, tenant, or occupier of premises need not retreat and may use deadly force against any person

engaged in the commission of an unlawful breaking and entering or burglary. G.L. 1956 (1981 Reenactment) § 11–8–8, as amended by P.L.1984, ch. 212, § 1.

■ In *Quarles*, this court held that a person has an obligation to attempt retreat even in the face of deadly attack, if the assailant and defendant are cotenants. Although we take the general doctrine of retreat to be settled in this State, the case before us presents an exception to this rule that has not previously been squarely considered by this court. The precise issue is whether a person must attempt retreat if the assailant has no lawful right to enter the dwelling and threatens to inflict bodily harm. A review of the case law indicates that a majority of jurisdictions have recognized the castle doctrine which provides that one need not retreat from one's place of dwelling before using deadly force to repel an assailant. *See, e.g., Hedges v. State*, 172 So.2d 824, 827 (Fla.1965) ("[w]hen one is violently assaulted in his own house * * * he is not obliged to retreat but may stand his ground and use such force as prudence and caution would dictate to avoid as necessary death or great bodily harm"); *Gainer v. State*, 40 Md. App. 382, 388, 391 A.2d 856, 860–61 (1978) ("[t]he castle doctrine permits a person who is without fault and is attacked within his dwelling * * * to stand his ground and defend himself, even if a retreat could be safely accomplished"). *See also* W. Lafave & A. Scott, *Substantive Criminal Law* § 5.7F at 657–58 (1986).

This exception to the general duty to retreat is summarized in *Wharton's Criminal Law* § 129 at 143 (Torcia, 14th ed.1979) as follows:

"When a dwelling house is entered or attempted to be entered by force and under such circumstances as to give rise to a reasonable belief that the occupant's life is endangered or that the intruder intends to commit a felony, the occupant may use deadly force, if reasonably necessary, to prevent or terminate such entry."

This court has recognized that the General Assembly has by virtue of § 11–8–8 cre-

ated a presumption in favor of one who defends his home against a person who feloniously enters in the event that the intruder sustains a personal injury or dies. *In re Paul F.*, 543 A.2d at 257. Moreover, we believe that adoption of this exception to the general requirement of retreat will effectuate the public policy that underlies § 11–8–8. Consequently we are of the opinion that defendant was entitled to an instruction and that defendant was under no duty to retreat when the assailant had entered defendant's dwelling.

■ The next issue concerns the relevancy of testimony concerning Almeida's reputation. At trial defendant presented the testimony of George Joyal who testified that he was familiar with Almeida's reputation in the community for being a violent man and a bully. Under Rule 404(a)(2) of the Rhode Island Rules of Evidence this testimony was properly admitted.

■ To impeach the testimony of Joyal, the state on cross-examination questioned him concerning whether he was familiar with Almeida's family history, personal habits, and favorite color. The state also presented Almeida's sister who testified regarding the victim's attendance at church and his family history. The testimony of Almeida's sister and the cross-examination in regard to Joyal's lack of knowledge of Almeida's family history, personal habits, and favorite color shed no light on Almeida's reputation or Joyal's knowledge of Almeida's reputation in the community. This testimony is irrelevant and at trial should be excluded on defendant's objection.

■ A related issue involves the propriety of instructing the jury that evidence of Almeida's reputation for violence might be considered when determining whether he was the aggressor in the case. The trial justice refused to give such an instruction because there was no evidence that defendant was aware of Almeida's reputation for violent behavior. This court in *State v. Infantolino*, 116 R.I. 303, 313, 355 A.2d 722, 728 (1976) held:

"When a defendant has pleaded self-defense, he may introduce evidence of his adversary's reputation for violent behav-

ior in order to show either the reasonableness of the defendant's fear at being injured or the fact that the adversary was the aggressor. If the defendant was *aware* of this reputation when he defended himself, this evidence is pertinent on both issues. If he was *unaware*, the evidence is limited to determining who was the aggressor."

Accordingly defendant was entitled to an instruction that evidence of Almeida's reputation should be considered when determining if Almeida was the aggressor.

■ The jury instructions were also insufficient in that the only possible offenses submitted to the jury were first-degree murder, second-degree murder and involuntary manslaughter. There was in the record, sufficient evidence to warrant an instruction on voluntary manslaughter and accident. Manslaughter is the unlawful killing of a human being without malice aforethought, either express or implied. *State v. Hockenhull*, 525 A.2d 926, 929 (R.I.1987). Voluntary manslaughter is the product of a deliberate act that does not include the element of malice aforethought by reason of one or more mitigating factors. *Id.* These mitigating factors include the heat of passion that arises as a result of adequate provocation. Heat of passion may be aroused by "fear and terror as well as anger." *State v. Williams*, 432 A.2d 667, 669 (R.I.1981).

■ In the case at hand defendant presented evidence that Almeida entered defendant's apartment uninvited, ignored repeated warnings to leave, and then attempted to draw a weapon. As such there was sufficient evidence presented that the jury could have concluded that defendant's decision to fire his weapon was the result of fear generated by the victim's actions. Therefore, an instruction on voluntary manslaughter would have been entirely appropriate.

■ In addition, sufficient evidence was presented to warrant an instruction on accident. At trial the jury was read a statement given by defendant to the police in

which he stated the shooting was accidental.

"Q. What happened next?

"A. He sort of, he sort of lunged at me while at the same time began reaching to his rear pocket with his right hand. I was scared at this time and felt that he was reaching for a weapon. I went to back up, but I bumped the refrigerator. I did not pump the once [*sic*] but there was a round in the chamber. I didn't know that at that time. The gun went off at that time. When it discharged, I was starting to look over my shoulder to see what was behind me. When I looked back at him, I saw him laying on the floor, bleeding from the mouth."

The defendant also presented the testimony of Carl Majesky a firearms expert, who testified that the gun could discharge accidentally if a person's finger was on the trigger:

"Q. So that gun could discharge by the mere bumping into a refrigerator or wall, if the person had their finger on the trigger; is that correct?"

"A. Yes, sir. That's correct; yes, sir."

This court has repeatedly held that a criminal defendant is entitled

to instructions that explain those propositions of law that relate to material issues of fact that the evidence supports. *State v. Durand*, 465 A.2d 762, 766 (R.I.1983); *State v. D'Alo*, 435 A.2d 317 (R.I.1981). On the basis of the defendant's statement, the testimony of Majesky, and the sequence of events that led up to the shooting, it is apparent that there was sufficient evidence to warrant the defendant's requested instruction on this point.

For all these reasons the defendant's appeal is sustained, the judgment of conviction is vacated, and the case is remanded to the Superior Court for a new trial.