**STATE**

v.

**Jack RUFFNER.**

No. 2004–356–C.A.

Supreme Court of Rhode Island.

Dec. 15, 2006.

Jane M. McSoley, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

The defendant, Jack Ruffner, appeals from a Superior Court judgment of conviction entered after a jury found him guilty of murder in the second degree. The trial justice's refusal to instruct the jury on the lesser-included offense of voluntary manslaughter forms the basis of the defendant's appeal. The defendant also contends that the trial justice committed reversible error by excluding a 911 dispatch report as evidence for the jury to consider. For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts and Procedural History

On August 12, 2002, defendant struck Clarkie "Pete" Smith in the head with a

wooden table leg, and left him lying face down, unconscious, on the sidewalk. Five days later, on August 17, 2002, Mr. Smith died at Rhode Island Hospital from skull fractures and brain injuries caused by blunt force trauma. The events immediately preceding the fatal encounter between defendant and Smith were recounted by several witnesses at trial, and are largely undisputed.

Mr. Smith lived with his girlfriend, Alycia Lawson, at her house on Evergreen Street in the Mount Hope neighborhood of Providence. Mr. Ruffner also lived in the area, and was acquainted with both Smith and Ms. Lawson. Ms. Lawson testified that on the night of August 12, 2002, she and Smith sat on a wall outside an abandoned house on the corner of Camp and Grandview Streets drinking alcohol recently purchased from a nearby liquor store. The defendant, taking advantage of the pleasant summer evening, was walking in the neighborhood. As he walked by the couple, Smith commented loudly to Ms. Lawson, "There is your boyfriend." Mr. Smith then advanced toward defendant and grabbed him around the neck. The two scuffled, causing Smith to fall to the ground. Mr. Smith continued to kick out at defendant until Ms. Lawson intervened and separated the two combatants, whereupon defendant walked away.

Ms. Lawson testified that after defendant left, Smith began to punch, kick, and swear at her. Ms. Lawson said that she immediately returned to her house, locked the door, and started to pack Smith's clothing. As she did so, she heard Smith knock on the window demanding entry. Ms. Lawson refused to let him in, so Smith kicked in the front door. According to Ms. Lawson, as the couple continued to yell and scream at each other, Smith went into the kitchen, pulled a knife from the drawer, and threatened to kill her. Shortly thereafter, the police arrived. Ms. Lawson testified that Smith then came out the front door with a bag of his belongings and walked up Camp Street, dropping the knife on her porch as he left.

Later that evening, Mr. Smith and defendant had another confrontation at the same abandoned house on the corner of Camp and Grandview Streets where they had fought earlier that evening. At the time, Rhonda Goode and her friend Ivory Fisher were driving on Camp Street on their way to a nearby bar. Ms. Goode, who drove the car, testified that as she drove by, she noticed Smith and defendant engaged in a struggle. Ms. Goode said that she next saw defendant hit Smith in the head with a long thin object, likely a stick or a pipe, causing Smith to fall to the ground. Ms. Goode also testified that defendant continued to hit Smith in the head with this object a couple of more times while Smith remained on the ground.

Ms. Fisher, the passenger in the car, also testified that she saw Smith and defendant engaged in a fistfight before she saw Smith fall to the ground. Contrary to Goode's testimony, however, Fisher said that as Smith lay on the ground, defendant walked over to the side of the abandoned house and grabbed a wooden stick from the nearby bushes. The defendant then returned, Fisher said, and hit Smith approximately five times in the head with the wooden stick. Moments after he finished beating Smith, defendant walked away and Fisher got out of the car to check on Smith. When she noticed that he was not moving, she ran down the street and told Roger Lanctot, Smith's friend, that Smith was injured. Mr. Lanctot then called the paramedics.

Mr. Ruffner's primary defense at trial was that, fearing for his own life, he struck Smith in self-defense. As his trial counsel explained in his opening statement, "[H]e

did the only thing in his mind he could do, the only thing he thought was reasonable at the time."

Testifying on his own behalf, defendant explained that on August 12, 2002, he spent the early evening hours at a friend's house, playing pool, drinking alcohol, and smoking a "couple of joints." He left his friend's house at about 9 p.m., intending to return to his house, on the same street as his friend's house. Because of the pleasant evening, however, defendant decided instead to take a walk around the neighborhood. He walked on his street and turned right on Camp Street. As he turned the corner of Camp Street onto Grandview Street, he noticed Mr. Smith and Ms. Lawson sitting on a wall outside an abandoned house on that corner:

The defendant testified that, as he passed the couple, Smith said to Ms. Lawson, "[T]here is your boyfriend right there." Ms. Lawson then turned toward defendant and responded, "You're supposed to be my man now, Jack." Confused, defendant asked the couple what they were talking about. The defendant testified that Smith then approached him "in a rage" and began cursing at him. As defendant tried to walk away, Smith swung at him and then grabbed him around the neck. In an effort to remove Smith's hands from his neck, defendant said he punched Smith, causing Smith to fall to the ground. Mr. Smith continued to kick and punch from the ground and then reached out and grabbed hold of defendant's leg. At that time, defendant asked Ms. Lawson for assistance in getting Smith to let go. The defendant said Ms. Lawson finally jumped on top of Smith after Smith pulled a knife from his pocket.[1] As Ms. Lawson wrestled with Smith, defendant freed himself from Smith's grip and began to walk away.

Mr. Ruffner then testified that he walked on Grandview Street and stopped at a house where he encountered some friends having a party. When someone at the party asked him with whom he had been fighting, defendant told them that he had been involved in a scuffle with Pete Smith. Hearing that, one of the party-goers told defendant that Smith was "crazy" and carried a knife. Pointing to a pile of wood, he suggested that defendant arm himself in case he had another encounter with Smith. Heeding this advice, defendant retrieved a wooden table leg from the pile.

The defendant testified that when he left the party, he hopped the fence behind the house where the party was taking place, intending to take a shortcut through backyards, driveways, and alleyways to his home on Woodbine Street. As he made his way home by way of this shortcut, defendant reached Evergreen Street, where Ms. Lawson's house was located. There he heard Smith banging on the door and demanding entry into the house. After Smith entered the building, defendant waited a few minutes to cross the street. As he did so, however, Smith exited the house and saw defendant. The defendant testified that upon seeing him, Smith once again yelled, "[T]here's your boyfriend." The defendant said he then turned around and backtracked over the shortcut path back to Grandview Street.

Mr. Ruffner testified that he made his way on Grandview Street and stopped at the corner of Grandview and Camp Streets when he ran into two acquaintances. The three men all sat down on the steps of the

---

1. Ms. Lawson denied ever seeing Mr. Smith with a knife during the altercation with defen- dant.

same ill-fated abandoned house where defendant and Smith had scuffled earlier that evening. As the three of them talked about the evening's events, one of the men noticed Smith approaching them. The defendant testified that he asked the two men to go across the street to avoid drawing Smith's attention to defendant. At first, defendant said he escaped Smith's notice because Smith's attention was drawn to the two men across the street. The two men asked Smith if he was all right and Smith responded: "[D]on't worry about me; you worry about Alycia or Jack. When I see him I'm going to 'f' him up." Upon hearing this, defendant said he stood up and asked Smith, "[W]hat did you say?"

Mr. Ruffner then testified that when Smith turned around and noticed him, Smith pulled a knife out of his pocket and slashed at defendant, cutting his chest. Articulating that he feared for his life, defendant testified that he picked up the table leg he had carried with him from the party and hit Smith in the head.[2] According to defendant, the blow to Smith had no effect, and Smith continued to advance at him. The defendant testified that he swung again at Smith, this time hitting Smith in the back of the head as Smith turned away from the blow, whereupon Smith fell to the ground. The defendant said he stayed for "probably ten seconds," then "just turned and [ ] walked down Grandview." Describing Goode and Fisher's testimony as "inaccurate," defendant testified that he did not hit Smith with the table leg after Smith had fallen to the ground.

To support his claim of self-defense, Mr. Ruffner also testified about a previous incident in which an irate Smith had threatened him with a knife. The defendant explained that Smith was angered because he believed defendant had sent an individual named "Jocko" over to Smith's house. The defendant presented James Hayes, defendant's friend and an acquaintance of Smith's, to corroborate this testimony. Mr. Hayes further testified that Smith was "an all right guy" who would "get drunk just like anyone else gets drunk, and get loud; get violent." Mr. Hayes also said that Smith always carried a knife because he was an auto mechanic.

At the close of the evidence, defense counsel requested a jury instruction on the lesser-included offense of voluntary manslaughter, as well as an instruction on self-defense. The trial justice declined to give an instruction on voluntary manslaughter, and the jury returned a guilty verdict of second-degree murder on June 1, 2004. The trial justice later denied defendant's motion for a new trial and sentenced defendant to life in prison.

## II

### Jury Instructions

■ The defendant's first argument on appeal is that the trial justice committed reversible error by not instructing the jury on the lesser-included offense of voluntary manslaughter. Although the trial justice submitted the issue of self-defense to the jury, he declined to instruct the jury on voluntary manslaughter. The defendant maintains that sufficient evidence was presented at trial to support a possible conviction on the lesser-included offense.

■ A defendant is entitled to an instruction on a lesser-included offense when the evidence produced at trial justifies

---

**2.** Mr. Ruffner also testified that as Smith advanced toward him with the knife, his back was up against the wall.

such an instruction. *State v. Coningford*, 901 A.2d 623, 630 (R.I.2006). A trial justice should give such a charge when "some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." *State v. Motyka*, 893 A.2d 267, 284 (R.I.2006) (quoting *State v. McGuy*, 841 A.2d 1109, 1112 (R.I.2003)). A trial justice, however, is not required to instruct the jury on a lesser-included offense when there is "no dispute as to the essential element that distinguishes the greater and the lesser offenses." *State v. Ortiz*, 824 A.2d 473, 485 (R.I.2003) (quoting *State v. Brown*, 549 A.2d 1373, 1378 (R.I. 1988)).

▆▆▆ On appeal, this Court examines the record to determine whether the evidence presented at trial warranted an instruction on the lesser-included offense. *State v. Rodriguez*, 822 A.2d 894, 910 (R.I. 2003). "[A] trial justice's refusal to instruct the jury on a lesser-included offense is reviewed by this Court on a *de novo* basis." *Coningford*, 901 A.2d at 630 (quoting *Motyka*, 893 A.2d at 281). If a rational jury could not support a finding for a lesser-included offense after considering the evidence produced at trial, "then the failure to instruct the jury on a lesser-included charge does not constitute reversible error." *Rodriguez*, 822 A.2d at 910. Thus, this Court will look to the evidence to ascertain whether " 'an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question.' * * * When there is no such dispute, our review is at an end." *State v. Garcia*, 883 A.2d 1131, 1137 (R.I.2005) (quoting *State v. Froais*, 653 A.2d 735, 737 (R.I.1995)).

▆▆▆ The distinguishing element between voluntary manslaughter and murder is the presence *vel non* of malice aforethought. Murder, both first and second degree, is "[t]he unlawful killing of a human being with malice aforethought." G.L.1956 § 11–23–1. Voluntary manslaughter is a lesser-included offense within the crime of murder, and is defined as "an intentional homicide without malice aforethought [committed] in a sudden heat of passion as a result of adequate legal provocation." *Ortiz*, 824 A.2d at 486 (quoting *State v. Kaner*, 463 A.2d 1348, 1351 (R.I.1983)). Heat-of-passion manslaughter exists when: " '(1) the provocation * * * [is] so gross as to cause the ordinary reasonable man to lose his self[-]control and to use violence with fatal results, and (2) the defendant * * * [is] deprived of his self[-]control under the stress of such provocation and * * * committed the crime while so deprived.' " *Garcia*, 883 A.2d at 1137–38 (quoting *State v. Winston*, 105 R.I. 447, 453, 252 A.2d 354, 357 (1969)). Adequate provocation arises, *inter alia*, when the defendant reasonably fears imminent death or serious bodily harm. *McGuy*, 841 A.2d at 1113. Mere words or gestures, unaccompanied by a physical action that threatens bodily injury or death, do not constitute adequate provocation. *Id.* Adequate provocation may exist, however, when the victim attacks the defendant with a lethal weapon, thereby placing the defendant in fear of death or serious bodily harm. *Id.*

Bearing these principles in mind, we carefully have examined the record in our *de novo* review. Although we are well satisfied that ample evidence exists from which a jury might find that defendant acted in response to a legally adequate provocation, we conclude that the evidence is insufficient for a rational jury to find that he acted in the heat of passion. On the contrary, defendant's own testimony belies the notion that the fatal blow to Smith's head resulted from the loss of his self-control rather than from a reasonable belief that he was in imminent danger of

bodily harm. Thus his testimony, if believed, speaks to his theory of self-defense, a theory that the jury rejected. Neither his testimony nor any other evidence, however, warranted an instruction on voluntary manslaughter.

With respect to the element of adequate provocation, defendant testified that Smith slashed him with a knife, cutting him in the chest and causing defendant to feel "very frightened" and scared for his life. Moreover, this was not the first encounter between the two that evening. The defendant testified that earlier that evening Smith had grabbed him around the neck, describing the latter as upset, very angry and "in a rage." He also observed Smith direct his violent behavior toward Ms. Lawson, and then later he watched as Smith yelled and banged on her door. Further, not only did defendant say he was warned that Smith was "crazy" and carried a knife, but also he testified about an incident on an earlier date when Smith brandished a knife at him. Clearly, evidence was presented at trial tending to lend credence to defendant's assertion that he was very frightened when he grabbed the table leg and struck Smith.

Before a defendant is entitled to an instruction on voluntary manslaughter, however, a second inquiry must be satisfied. To warrant such an instruction, there also must be some evidence that the defendant acted in the heat of a sudden and uncontrollable passion. As we explained in *McGuy*, 841 A.2d at 1114, "[h]eat of passion exists when the defendant suddenly and temporarily loses his self-control as a result of experiencing some overpowering emotion—such as extreme fear, terror, or anger—caused by a legally adequate provocation * * *." One treatise writer has stated: "Although anger may be the emotion most often claimed in heat-of-passion cases, the defense is not so limited. 'Pas-

sion' includes any 'violent, intense, high-wrought, or enthusiastic emotion.'" Joshua Dressler, *Understanding Criminal Law* § 31.07[B][1] at 490 (1995). In *State v. Infantolino*, 116 R.I. 303, 307, 355 A.2d 722, 725 (1976), we described heat of passion as "uncontrollable rage, anger and resentment."

In the case at hand, the notion that defendant acted in the sudden heat of passion is negated by his own testimony. When asked what he did after he "grabbed" the table leg, defendant testified, "When I grabbed the table leg my back [was] against the wall[.] I swung it at the time just to try to get him back." When asked if it was his intention to kill Smith, he replied, "Definitely not. My intention was to kill nobody. * * * My intent was to disable him; disable him with the knife; make him stop coming at me." The defendant further testified, "I struck him one time. Didn't do anything, and he kept coming, so I swung again. This time I had swung again the same way and I turned all the way around. I hit him in the back of his head, and now he falls down towards me." The defendant said he stayed probably ten seconds, then "just turned and walked down Grandview."

On cross-examination, defendant elaborated on his motivation in hitting Smith. He said, "My motive, my objective was to hit him in the back of the head, stop him." When asked whether he hit Smith a second time to protect himself or to kill Smith, defendant responded, "No, I was protecting * * *." Only on redirect examination, in response to his attorney's question, did he indicate that he didn't have time to think about his actions.

■■■■ While the evidence tended to support defendant's articulated theory of self-defense, a theory that the jury consid-

ered and rejected, it does not bespeak of voluntary manslaughter.[3] Rather, we are satisfied that a rational jury could not conclude that defendant had lost his self-control as the result of experiencing an overpowering emotion. As indicated by defendant's own testimony, his actions were not the result of uncontrollable passion, but rather were motivated by an arguably very reasonable desire to protect himself from the knife-slashing Smith. Nor does the testimony of the only other two eyewitnesses, Goode and Fisher, support a finding of voluntary manslaughter. Neither saw the altercation between Smith and defendant begin. Ms. Fisher testified that the two were fistfighting when she first observed them that evening. According to Fisher, Smith fell face down on his stomach. She said that after Smith fell, defendant "picked up a little brown stick" from nearby bushes, and proceeded to hit the prostrate Smith five times on the top of his head, saying, "I told you so." Then defendant threw the stick down and walked away. Ms. Goode offered a somewhat different account of the fatal encounter. According to Goode, defendant struck Smith in the head with a long thin object, causing Smith to fall. The defendant continued to hit him twice more while Smith was on the ground; then defendant walked down Grandview Street. Neither of the two accounts, however, provides sufficient evidence from which the jury might conclude that defendant was acting out of some intense, overpowering or uncontrollable emotion. Although Goode's version arguably portrays Ruffner as acting in a manner that one conceivably could construe to border on a loss of self-control, it nevertheless would require a significant speculative leap for a jury to infer heat of passion from her testimony, particularly in light of defendant's own testimony that contradicts her account.

We are satisfied, therefore, based upon our *de novo* review, that the evidence is insufficient to support a finding that defendant struck Smith while acting in the heat of passion. The jury was free to find that defendant reasonably believed that he was in imminent danger of bodily harm and that he used a reasonable degree of force to protect himself. The jury did not so find. It is clear to us, however, that the jury was not entitled to find that defendant acted out of a sudden and uncontrollable passion. Thus there is no actual and adequate dispute about the distinguishing element between the lesser and greater crimes, *i.e.*, malice aforethought, and the trial justice did not commit reversible error by declining to instruct the jury on voluntary manslaughter.

---

**3.** A claim of self-defense to a charge of murder requires evidence that the defendant reasonably feared that he or she faced death or imminent danger of bodily harm at the hands of another. *State v. Urena*, 899 A.2d 1281, 1288 (R.I.2006). "Self-defense does not require proof that the defendant acted in the throes of intense passion; an act of self-defense can be committed coolly and deliberately. By contrast, a claim of heat of passion presupposes that the defendant has acted unreasonably on account of intense emotional excitement. * * * Heat of passion requires no evidence that defendant believed, reasonably or unreasonably, that deadly force was necessary." *Howell v. State*, 917 P.2d 1202, 1211 n. 7 (Alaska 1996). Although self-defense and heat of passion have different requirements, "[a] rejection of one ordinarily does not preclude the other." *Id.; see also State v. Ortiz*, 824 A.2d 473, 487–88 (R.I.2003) (evidence sufficient to allow jury instruction on both self-defense and voluntary manslaughter); *State v. Ventre*, 811 A.2d 1178, 1184 (R.I.2002) (trial justice erred in not instructing jury on voluntary manslaughter); *State v. Fetzik*, 577 A.2d 990, 992, 995 (R.I. 1990) (evidence presented warranted an instruction on heat-of-passion manslaughter as well as self-defense).

## III

### 911 Tape

■ The defendant next argues that the trial justice erred in refusing to allow the defense to introduce a 911 dispatch report into evidence. The 911 report documents a telephone call made by Arthur Lawson,[4] a neighbor of Alycia Lawson, who called to report that people were fighting outside his house and that a male was saying he was "gonna kill everyone." The dispatch report did not identify the person making such threats.[5]

Before trial, the state filed a motion *in limine* asking the trial justice to preclude evidence that shortly before the lethal confrontation that evening Mr. Smith had threatened Ms. Lawson with a knife. After hearing oral arguments from both parties, the trial justice refused to allow the evidence because defendant's lack of knowledge concerning the incident made the testimony irrelevant to his self-defense claim. The trial justice later agreed, however, to conduct a voir dire of Ms. Lawson at the close of the state's case. After conducting the hearing, the trial justice allowed Ms. Lawson to testify about the fracas between Smith and herself that occurred at her residence that evening. The trial justice refused, however, to admit the 911 dispatch report, stating that the report was "rank, total hearsay" and questioning the reliability of the report. Counsel for defendant disagreed, arguing that the dispatch report fell within the present sense

impression [6] and excited utterance exceptions [7] to the hearsay rule.

■ "The admission of a statement under an exception to the hearsay rule is within the sound discretion of the trial justice and shall not be overturned unless clearly erroneous." *State v. Lynch,* 854 A.2d 1022, 1038 (R.I.2004); *see State v. Torres,* 787 A.2d 1214, 1222 (R.I.2002) (admissibility of an excited utterance clearly within the trial justice's discretion and will not be overturned unless there is an abuse of that discretion); *Estate of Sweeney v. Charpentier,* 675 A.2d 824, 827 (R.I.1996) (admissibility under the residual exception to the hearsay rule clearly within the discretion of the trial justice and will not be overturned unless there was an abuse of that discretion resulting in prejudice). On appeal, defendant asserts that the trial justice committed reversible error because the 911 dispatch report was admissible under the present sense impression and excited utterance exceptions to the hearsay rule. The state contends, however, that there was no error because the report constituted inadmissible character evidence about the victim's previous bad conduct of which defendant admittedly was unaware. Although the state concedes that the case law cited by the defense adequately demonstrates the admissibility of the 911 report as a hearsay exception, the state also maintains that the trial justice did not commit reversible error because the defense was able to introduce

---

4. There is no indication in the record about whether Arthur Lawson was related to Alycia Lawson.

5. The time and location referred to in the dispatch report give rise to the high probability that the male referred to in the report is, in fact, Mr. Smith.

6. The present sense impression exception pertains to a "statement describing or explaining

an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." R.I.R. Evid. 803(1).

7. The excited utterance exception applies to a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." R.I.R. Evid. 803(2).

the same evidence through another witness, *viz.*, Alycia Lawson.

We agree with the state that, at most, the exclusion of the 911 dispatch report was harmless error. As previously recognized by this Court, the exclusion of testimony on hearsay grounds is not reversible error when a party successfully introduces the same evidence through another witness. *See State v. Briggs,* 886 A.2d 735, 750 (R.I.2005). Here, Ms. Lawson testified that Smith kicked in her door and threatened her with a knife shortly before his fatal encounter with defendant. The proffered evidence reports that a male was outside Ms. Lawson's house threatening to kill everyone. We are satisfied that defendant was not prejudiced by having the dispatch report excluded from evidence because the jury was provided similar evidence, by Ms. Lawson's testimony, tending to support defendant's assertion that he acted out of self-defense. While the dispatch report may have suggested that Smith's rage was directed at the world at large and not just at Ms. Lawson, the latter's testimony clearly demonstrated that Smith was in an agitated and violent state when he left her house, and thus the jury reasonably could have concluded from this information that Smith was the aggressor in the subsequent fray with defendant.

Because the trial justice did not commit reversible error by refusing to admit the 911 report as a hearsay exception, we need not address the state's argument that the report constituted inadmissible character evidence.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction, and we remand the papers in the case to the Superior Court.