March 18, 2026

State                          :

v.                          :

Johnny Xaykosy.              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State            :

v.            :

Johnny Xaykosy.            :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.**  The defendant, Johnny Xaykosy (defendant or Xaykosy), is before the Court on appeal from a Superior Court judgment of conviction for second-degree murder and discharging a firearm during a crime of violence, resulting in the death of Nikolas DiPanni (decedent or DiPanni).[1]  Prior to trial, the defendant entered pleas of guilty to two additional gun charges that did not come before the jury.  The defendant contends that the trial justice erred by refusing to instruct on the lesser-included offense of voluntary manslaughter; and that the sentence imposed was excessive.  For the reasons

---

[1] The spelling of the decedent's name varies throughout the record.  We adopt the spelling used in the trial transcripts.  We intend no disrespect.

discussed herein, we reject the defendant's claims of error and affirm the judgment of conviction.

## Facts and Travel

We note at the outset that defendant asserted the defense of self-defense before the jury. This Court observed in *State v. Tribble*, 428 A.2d 1079 (R.I. 1981), that "the very essence of the defense of self-defense is how the defendant perceived the situation at the time of the incident in question." *Tribble*, 428 A.2d at 1085. Therefore, we focus our analysis on defendant's trial testimony and supplement the relevant facts with the testimony of other witnesses.

The evidence at trial was clear, defendant was a longtime drug dealer. Xaykosy admitted that he had been selling drugs since 2014; and in 2017 he entered a plea of nolo contendere to a charge of possession with the intent to deliver cocaine, and he received a sentence of four years suspended, with probation.[2] It is also undisputed that in the late evening of April 22, 2021, defendant fatally shot the decedent in the chest on the heels of a drug transaction during which he sold cocaine to Cynthia McLintock (McLintock), a long-time customer, and the decedent's girlfriend.

---

[2] At the time of the incident on April 22, 2021, defendant was currently serving his probationary sentence from the 2017 conviction.

Earlier in the day, on April 22, 2021, defendant and McLintock arranged a transaction in which defendant agreed to sell McLintock drugs for DiPanni's use. The defendant maintained throughout trial that he did not know the decedent before the transaction that led to DiPanni's death on April 22, 2021. Later that evening, defendant arrived at an agreed-upon location, in a silver Toyota—a vehicle McLintock recognized from past drug transactions with defendant. McLintock arrived in a Chevrolet, along with the decedent and their friend, Nicholas Nevola (Nevola). McLintock exited the Chevrolet and met defendant in his vehicle, where the two briefly engaged in light conversation. To avoid looking suspicious, defendant and McLintock proceeded to drive around Providence in order to consummate the transaction. Apparently, this did not sit well with the decedent. As they were driving, defendant noticed a vehicle following the Toyota and could hear an individual screaming. Eventually, McLintock was able to identify DiPanni as the person yelling loudly.

According to defendant, McLintock used his cell phone to call the decedent, and he immediately heard a male voice "calling [McLintock] a name and threatening her." McLintock kept the device on speakerphone. The defendant testified that the decedent threatened McLintock, stating that "[h]e was going to f* * * her up, [and] beat her f* * *ing a* *," and he continued to berate McLintock with expletives. The defendant testified that he told McLintock to tell the decedent

to relax and that there was a vehicle behind them, at which point, the decedent exclaimed, "Oh, that's me, you fat b* * *h."

After the decedent threatened McLintock, he made additional threats, laden with expletives, toward defendant. Although defendant maintained that he did not respond to the decedent's comments, McLintock testified that "[defendant] had said to me, 'I got something for this motherf* * *er,' and [that the decedent] heard [defendant] say that." Although defendant admitted that he said, "I had something for him," defendant denied having ever called the decedent the profanity. The defendant testified that he intended to bribe the decedent with more cocaine in order to calm him down because he was worried about the threats the decedent made toward McLintock. Knowing DiPanni was upset, defendant testified that prior to McLintock exiting the vehicle, he promised her that he would not get out of his vehicle, nor would he fight with the decedent.

At trial, defense counsel presented a surveillance video of defendant's vehicle during the transaction and shortly thereafter. According to defendant, once McLintock had the drugs in hand, he brought his vehicle to a complete stop, with his foot on the brake. McLintock returned defendant's cell phone and paid cash for the drugs. Once McLintock exited the vehicle, defendant kept his foot on the brake—never placing the vehicle in park—and began counting the cash proceeds. The defendant related that he was "relaxed the whole time." Meanwhile, after

McLintock exited his vehicle, he could hear the decedent's screams become louder as the decedent approached his vehicle. With his foot on the brake, defendant locked his doors, but opened the window on the passenger side in order to "defuse the situation because [McLintock] clearly didn't defuse it." The decedent approached defendant's passenger door, grabbed the handle of the locked vehicle, and yelled "I'll f* * *ing kill you" and "Get out of the f* * *ing car, tough guy." Moments later, defendant testified, he became terrified when he saw what he believed to be a firearm in the decedent's right hand; so he reached down, grabbed his own firearm, and fired one shot in the direction of the decedent.[3]

It was then that defendant fled the scene, tossed the firearm into "a wooded area * * * [w]ithin like Providence/Cranston borderline," and headed straight home. The defendant did not make an emergency call to 911 at the scene, nor upon returning home. In fact, when he arrived home, defendant emptied his vehicle of his drug supply, searched for shell casings, and disposed of the single shell casing that was ejected upon firing. According to defendant, he was unaware the decedent

---

[3] At trial, defendant testified that as the decedent approached his vehicle, he noticed the decedent holding an object in his right hand, and that it "seem[ed] like [he was] concealing something, and I thought it was a gun." According to Providence Police Detective Thomas Richards, a bottle of Dunkin' Donuts creamer was found at the scene. Nonetheless, defendant maintained that he could not identify the item, stating "I thought it was a gun. That's the first thing I thought of" because "[the decedent] just threatened me that he was going to f* * *ing kill me."

had died until he saw the news the next day. Despite learning of the decedent's death, Xaykosy never turned himself into the police because, he claimed, he "wasn't in the right state of mind. [He] was still shocked."

On the evening of April 23, 2021, the day after the homicide, police officers found Xaykosy driving around Providence; and he was arrested. The defendant subsequently was indicted by a grand jury and charged with four counts—murder; discharging a firearm while committing a crime of violence, to wit, murder; carrying a pistol without a license; and possession of a firearm having been previously convicted of a crime of violence. As noted, Xaykosy pled guilty to counts 3 and 4 before trial but also acknowledged the pleas during his trial.

At the close of evidence, defendant requested a voluntary manslaughter instruction. With explicit findings, the trial justice denied defendant's request, concluding:

> "The record before me demonstrates that the defendant was very calm and well collected. By his own testimony, he boasted on direct examination that he was 'relaxed the whole time.' Even when [the decedent], although he knew him only as [McLintock's] friend or boyfriend, was screaming and unnerving [McLintock], the defendant told her, 'Relax. It's not a big deal,' trying to calm her down.
>
> "Indeed, he explained his comment, 'I have something for him' 'excluding the motherf'er' sobriquet[], as not at all retaliation with his weapon, but instead some extra cocaine to placate [the decedent].

- 6 -

"Returning to [*State v. Ruffner*, 911 A.2d 680 (R.I. 2006)], I repeat what the Court said there, 'An act of self-defense can be committed cooly [*sic*] and deliberately. By contrast, a claim of heat of passion presupposes that the defendant had acted unreasonably on account of intense emotional excitement.' It's [*Ruffner*, 911 A.2d at 688 n.3].

"I do not find that 'intense emotional excitement' here in this case. When [the decedent] approached the defendant's car, Mr. Xaykosy was not at all distracted or disturbed by [the decedent's] prior hollering. Instead, the defendant was apparently simply relieved to have his cell phone returned, and otherwise simply sat in his car counting the proceeds of the cocaine sales he just completed with [McLintock], instead of driving away, as he said he could have, without obstruction. * * *

"But under my sense of the record, as a front-row observer, there was no adequate provocation as, after all, the defendant did not appear or recount that he had been particularly, if at all, very bothered or concerned about [the decedent's] yelling. The defendant was only concerned with [McLintock's] well-being rather than his own.

"He recounted that he was relaxed, he tried to calm [McLintock] down, and he even was ready to offer DiPanni extra cocaine as a way to defuse the situation * * *."

In reliance on *State v. Garcia*, 883 A.2d 1131 (R.I. 2005), and *State v. Winston*, 105 R.I. 447, 252 A.2d 354 (1969), the trial justice concluded that there was "neither the requisite adequate provocation nor the heat of passion which are essential predicates for a voluntary manslaughter instruction, and I shall therefore not offer it to the jury." Defense counsel objected to the trial justice's ruling.

- 7 -

A jury found defendant guilty of second-degree murder and discharging a firearm during a crime of violence, to wit, murder, resulting in the death of DiPanni. With respect to count 1, the trial justice sentenced Xaykosy to life in prison for second-degree murder; and as to count 2, Xaykosy was sentenced to serve a second consecutive life sentence for using a firearm to commit murder. On count 3, defendant was sentenced to serve an additional ten years suspended and ten years of probation, consecutive to count 4 to which defendant was sentenced to serve five years, consecutive to count 2. The defendant filed a premature but valid notice of appeal on April 18, 2023.[4] Thereafter, a judgment of conviction entered on April 19, 2023. Additional relevant facts will be set forth as necessary.

## Standard of Review

"This Court reviews 'jury instructions on a *de novo* basis.'" *State v. Isom*, 251 A.3d 1, 6 (R.I. 2021) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I. 2009)). "It is well established that, on review, we examine jury instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *Id.* (quoting *Ros*, 973 A.2d at 1166). "This Court will not examine a single sentence apart from the rest of the instructions, but rather the

---

[4] "[T]his Court will treat a premature appeal as timely filed." *State v. Forlasto*, 217 A.3d 489, 492 n.4 (R.I. 2019) (quoting *State v. Diamante*, 83 A.3d 546, 548 n.5 (R.I. 2014)).

challenged portions must be examined in the context in which they were rendered." *Id.* (quoting *Ros*, 973 A.2d at 1166).

## Analysis

### Voluntary Manslaughter Instruction

On appeal, defendant argues that the trial justice erred as a matter of law in denying his request for an instruction on voluntary manslaughter. Xaykosy relies on the recent case of *State v. Esdel*, 317 A.3d 756 (R.I. 2024), asserting that the facts presented in the case at bar are analogous to the facts presented in *Esdel* and that the trial justice ignored the fact that the decedent approached defendant's car with what appeared to be a firearm. Therefore, defendant argues, the trial justice erred in refusing to instruct on voluntary manslaughter. The defendant is mistaken.

"When determining whether a trial justice's refusal to give an instruction was warranted, 'this Court will examine the record in the case and determine whether the evidence justifies such an instruction.'" *State v. Fry*, 130 A.3d 812, 820 (R.I. 2016) (quoting *State v. Motyka*, 893 A.2d 267, 281 (R.I. 2006)). "In making this determination, our review is limited to 'ascertaining whether an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses in question.'" *Id.* (quoting *Motyka*, 893 A.2d at 281). In *State v. Gautier*, 950 A.2d 400 (R.I. 2008), we observed that, "[i]n determining whether the evidence calls for a lesser-included-offense instruction, the trial justice should not weigh the

credibility of the testimony; rather, he or she should consider whether, *at the very least, some minimal evidence exists that, if credited by the jury*, could support a conviction for the lesser-included offense." *Gautier*, 950 A.2d at 414 (emphasis added) (quoting *State v. McGuy*, 841 A.2d 1109, 1112 (R.I. 2003)).

"A trial justice commits prejudicial error when he or she refuses to give a jury instruction that the evidence entitles the defendant to receive." *McGuy*, 841 A.2d at 1112. On the other hand, this Court has also stated that a trial justice "should not instruct the jury on a lesser-included offense when the evidence wholly fails to support such a charge." *Id.*

In *Ruffner*, this Court recognized that the element of malice aforethought is the distinguishing factor between voluntary manslaughter and murder. *See Ruffner*, 911 A.2d at 686. "Murder, both first and second degree, is 'the unlawful killing of a human being with malice aforethought.'" *Id.* (brackets omitted) (quoting G.L. 1956 § 11-23-1). Whereas "[v]oluntary manslaughter is a lesser-included offense within the crime of murder, and is defined as 'an intentional homicide *without* malice aforethought committed in a sudden heat of passion as a result of adequate legal provocation.'" *Id.* (emphasis added) (brackets omitted) (quoting *State v. Ortiz*, 824 A.2d 473, 486 (R.I. 2003)).

"Voluntary manslaughter is an intentional homicide that does not include the element of malice aforethought by reason of one or more mitigating factors." *State*

*v. Ventre*, 811 A.2d 1178, 1184 (R.I. 2002). "The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter." *Ortiz*, 824 A.2d at 486 (quoting Wayne R. LaFave, *Criminal Law* § 7.10(a) at 704 (3d ed. 2000)). Significantly, however, conduct that is wanton and reckless also "can supply the element of malice that is necessary to raise homicide to the level of common-law murder." *State v. Iovino*, 524 A.2d 556, 558 (R.I. 1987). This is so because malice aforethought "consists of an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I. 1980).

In order for a homicide to amount to voluntary manslaughter, the element of adequate provocation, which "arises, *inter alia*, when the defendant reasonably fears imminent death or serious bodily harm," must be present. *See Ruffner*, 911 A.2d at 686. This Court has stated that "[h]eat-of-passion manslaughter exists when: '(1) the provocation is so gross as to cause the ordinary reasonable man to lose his self-control and to use violence with fatal results, and (2) the defendant is deprived of his self-control under the stress of such provocation and committed the crime while so deprived.'" *Id.* (brackets and deletions omitted) (quoting *Garcia*, 883 A.2d at 1137-38). We also recognize that "heat of passion may be aroused by fear and

- 11 -

terror as well as anger." *Ventre*, 811 A.2d at 1184 (brackets omitted) (quoting *State v. Fetzik*, 577 A.2d 990, 995 (R.I. 1990)).

In *Esdel*, the defendant was stopped at a traffic light at an intersection in Pawtucket. *See Esdel*, 317 A.3d at 761. He was trapped when the vehicles surrounding him "came to an abrupt stop; [and] several individuals—some of whom were armed—exited their vehicles, and quickly surrounded defendant, who remained inside his vehicle." *Id.* Within seconds, Esdel was encircled by several individuals, and he testified that he "felt boxed in," and "cornered," believing that "[his] life was over at that point." *Id.* at 763. He reached into his bag, grabbed a revolver, and raised his right arm, firing a single shot out the passenger side window, killing the decedent. *Id.* at 761. In addition to Esdel's testimony, a video from a Grubhub food delivery driver, who witnessed the altercation, was presented to the jury, evidencing the approximately four to five vehicles surrounding Esdel's vehicle. *Id.* at 761 n.2.

In light of this evidence, this Court recognized that "[t]he credibility of [Esdel's] testimony is committed to the jury; and, if believed, this evidence can serve to negate the element of malice aforethought for second-degree murder." *Esdel*, 317 A.3d at 768. "With respect to the element of 'sudden heat of passion,'" we further concluded that if believed, there was "more than a scintilla of evidence that defendant acted in a sudden heat of passion prompted by fear such that a jury

- 12 -

could find defendant was so 'deprived of his self-control' under the stress of such provocation that led him to quickly lean over to * * * grab the revolver, and let off a single warning shot." *Id.* at 768-69.

Contrary to defendant's arguments, *Esdel* is distinguishable. The evidence in *Esdel* indicated that the defendant was in fear for his life and that "the decedent's prior hostile history with [the] defendant—who was known to carry a firearm—are factors that could lead [Esdel] to fire the weapon in the heat of passion on sudden provocation." *Esdel*, 317 A.3d at 769. The evidence in this case does not correspond to the facts in *Esdel*. We conclude that Xaykosy's testimony fails to present sufficient evidence to support a finding that he acted in a sudden heat of passion as a result of adequate provocation. *See id.* at 766.

Significantly, the facts in *Esdel* suggest that bad blood existed between the defendant and the decedent, who made a threat to kill the defendant on a prior occasion. *See Esdel*, 317 A.3d at 769. This served as "minimal evidence" necessary to support a conviction for voluntary manslaughter. *Id.* (emphasis omitted); *see also Gautier*, 950 A.2d at 414. In the case at bar, there was no prior relationship between defendant and the decedent; nor was there any evidence at trial that the decedent made any threats toward defendant before their fateful encounter.

- 13 -

Turning to the events leading to the shooting, we are of the opinion that evidence to support the element of adequate provocation, sufficient to warrant an instruction for voluntary manslaughter, is lacking.

On the evening of April 22, 2021, McLintock and defendant drove around Providence near Allens Avenue to complete their transaction. During the drive, defendant testified that McLintock borrowed his cell phone to call the decedent. The decedent quickly answered the call and began threatening McLintock, stating that he was going to beat her, lacing his threats with expletives. He also threatened to "f* * * [defendant] up" and smash his windows with even more expletives. The defendant heard these threats because the phone call was on speakerphone. Yet defendant did not respond to the decedent's verbal threats, but instead, suggested McLintock tell him "to relax" and that "[t]here [was] a car behind us" to which the decedent responded, "Oh, that's me, you fat b* * *h." Once the transaction was consummated, defendant testified that he promised McLintock that he would remain in the vehicle, stating something to the effect of "I [have] something for him * * *." The defendant testified that he kept his foot on the brake, never placing the vehicle in park, and remained in his vehicle to count the proceeds. While counting his cash, defendant heard the decedent yelling, and as he drew near, defendant locked his doors, and rolled down the window so as to "defuse the situation because [McLintock] clearly didn't defuse it." The decedent reached for defendant's door

handle, and threatened defendant, stating "I'll f* * *ing kill you," and "Get out of the f* * *ing car, tough guy." It was at this moment, defendant testified, that he became terrified and saw what he believed to be a weapon in the decedent's right hand. Xaykosy reached down, grabbed his firearm, and without looking at the decedent, he fired one shot toward the decedent. It was after he fired his weapon that defendant took his foot off the brake, and fled the scene.

In reviewing defendant's testimony, we "apply an objective standard to determine whether an alleged provocation is legally sufficient" to warrant an instruction on voluntary manslaughter. *See McGuy*, 841 A.2d at 1113. Based on these facts, we are satisfied that the trial justice appropriately denied defendant's request for a voluntary manslaughter instruction.

The facts this Court considered in *Esdel* to determine whether an instruction of voluntary manslaughter was warranted differ from the facts and circumstances presented here. The defendant was calmly counting his money, there were no prior threats or bad blood between these individuals, and defendant had a clear means of escape. Therefore, it is our view that the trial justice did not err when he determined that there was insufficient evidence to support a finding of adequate provocation or sudden heat of passion.

We further observe that defendant's own testimony defeats the necessary element of "sudden heat of passion." The defendant's testimony fails to suggest

that he was "aroused by fear and terror as well as anger" while he was calmly counting his money. *See Ventre*, 811 A.2d at 1184 (quoting *Fetzik*, 577 A.2d at 995). Again, despite defendant's singular statement that he became "terrified" as the decedent approached his vehicle, he opened the window and never took his foot off the brake. Therefore, defendant's statement that he was "terrified" is not sufficient to establish that he "acted out of a sudden and uncontrollable passion." *Ruffner*, 911 A.2d at 688.

"[T]his Court has repeatedly recognized that 'a trial justice is not required to instruct the jury on a lesser-included offense when the evidence presented at trial completely fails to support such a charge.'" *Fry*, 130 A.3d at 820 (brackets omitted) (quoting *Motyka*, 893 A.2d at 285). Accordingly, the trial justice did not err when he rejected defendant's request to give a voluntary manslaughter instruction to the jury.

**The Sentencing**

The defendant raises a second issue on appeal, arguing that the trial justice erred by imposing an excessive sentence. The defendant contends that the life sentence on the second-degree murder conviction was discretionary and that, therefore, when the trial justice imposed such sentence he erred. The defendant seeks to distinguish murder in the first degree from that of murder in the second degree. In *State v. Monteiro*, 924 A.2d 784 (R.I. 2007), this Court upheld the

constitutionality of mandatory consecutive life sentences in the context of a first-degree murder. *See Monteiro*, 924 A.2d at 795. The defendant asserts that this is a case of first impression because this Court has not yet addressed consecutive life sentences within the context of murder in the second degree. The state objects on the ground that defendant does not contend that the life sentence for the second-degree murder conviction was illegal or unconstitutional. Significantly, the state further asserts that defendant's argument, that the trial justice erred by imposing an excessive sentence, is not ripe for this Court's review. We agree.

This Court has often declared "that the appropriate procedure for challenging an improper or illegal sentence is to *seek a revision of that sentence initially in the Superior Court* pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure." *State v. Ducharme*, 601 A.2d 937, 946 (R.I. 1991) (emphasis added); *see also* Super. R. Crim. P. 35. "In the absence of such a motion and determination thereof in the Superior Court, this [C]ourt will not consider issues involving the legality or propriety of a sentence." *State v. Bucci*, 430 A.2d 746, 749 (R.I. 1981); *see also State v. Lee*, 502 A.2d 332, 335 (R.I. 1985) ("This [C]ourt has unequivocally stated that the appropriate procedure for challenging an improperly or illegally imposed sentence is not to appeal directly to the Supreme Court but to seek revision of the sentence initially in the Superior Court under [Rule 35].").

Because the defendant failed to raise a Rule 35 motion before a justice of the Superior Court, we "will not consider issues involving the legality or propriety" of the sentence imposed by the trial justice. *See Bucci*, 430 A.2d at 749. To the extent the defendant maintains his conviction and sentence are constitutionally infirm, an application for postconviction relief is the proper avenue of relief. Therefore, the defendant's appellate argument concerning his sentence is not properly before this Court.

## Conclusion

For the reasons stated, we affirm the judgment of conviction. The papers in this case may be remanded to the Superior Court.

## STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Johnny Xaykosy. |
| **Case Number** | No. 2023-255-C.A. (P1/21-2390AG) |
| **Date Opinion Filed** | March 18, 2026 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br>For Defendant:<br><br>Michael S. Pezzullo, Esq. |