**STATE**

v.

**Arun ROS.**

State

v.

**Veasna Sin.**

Nos. 2006–87–C.A., 2007–98–C.A.

Supreme Court of Rhode Island.

July 1, 2009.

Virginia M. McGinn (Department of Attorney General), Rebecca Tedford Partington (Department of Attorney General), for Plaintiff.

Paula Rosin (Office of Public Defender), Robert B. Mann, Esq., for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice SUTTELL, for the Court.

The issues in this appeal arise from a New Year's Eve celebration that ended in tragedy, yet another lamentable incident of gang-related violence. As five companions left a party in the early morning hours of January 1, 2002, gunshots directed at their automobile resulted in the death of one passenger and the permanent paralysis of another. A jury convicted Arun Ros and Veasna Sin (the defendants), following a joint trial, on nine criminal counts relating to the shootings. The defendants raise a number of issues on appeal. They argue, primarily, that the trial justice committed reversible error in denying their motions for judgment of acquittal and in his instructions to the jury. Additionally, they perceive error in the extent of witness testimony the trial justice instructed the stenographer to read back to the jury in response to the jurors' request. Finally, they argue that they were denied the right to an impartial jury, in that the composition of the grand and petit juries did not represent a fair cross section of the community. For the reasons stated in this opinion, we affirm the convictions of both the defendants on all counts.

### I

### Facts and Procedural History

Revelers attending two parties enlivened Wendell Street in Providence during the waning hours of 2001.[1] The defendants were at a party at 48 Wendell Street, of which Sin was the host. The five aforementioned companions—Heang Ly Say,[2]

---

1. It seems clear that the animosity that precipitated the shootings on January 1, 2002 originated from gang memberships and rivalries, though evidence of such was not presented to the jury pursuant to a pretrial evidentiary ruling.

2. Heang Ly Say is but one of several versions of the victim's name that appear within the record. For the sake of simplicity we refer to him by the name that appears in the forensic examiner's report. We referred to him as "Heang Say" in a civil case arising out of the

Thanaroeuth Ngim, Khan Khea, Angel Alvarez and Perry Bun—were attending a party on the opposite side of Wendell Street. They decided to leave together a little after midnight. When they stepped outside, there were a number of other people out on the street. After getting in Khea's white Acura, one or more of the passengers noticed that someone outside was armed with a gun.

Almost immediately thereafter, bullets began striking the Acura. One passenger, Say, suffered a fatal gunshot wound to his head.[3] Another passenger, Ngim, endured a gunshot wound in his back, causing him a spinal cord injury that left him paralyzed from the waist down. The driver, Khea, and the other two passengers in the car, Alvarez and Bun, were not seriously harmed.[4]

The surviving occupants of the car had slightly different accounts of what occurred that night. Ngim testified that after driving past the people across the street, he looked back and saw "someone run out with a gun." He described that person as an Asian male wearing a dark hooded sweater and a dark ski hat, carrying a long black gun that he thought looked like an M–16. At that point, Ngim said, he turned around, heard a gunshot, and the next thing he knew, he felt a bullet in his back. Before he lost consciousness from his injury, Ngim remembered bullets knocking out the windows of the car and Say's neck bleeding.

Bun testified that within moments of getting into the car he heard someone else in the car say, "Duck down." He then heard gunshots, but never saw any gunmen. Alvarez testified that, before the shootings, he saw an Asian man across the street, whom he described as wearing a white shirt, dark pants, and a hat, holding a big, rifle-type gun, "like an AK–47." After that, "the car just started getting hit with shots." The driver, Khea, testified that after two of the passengers in the car warned him that someone on the street had a gun, he looked out the window and saw a person with a white shirt coming down a driveway on Wendell Street and holding something with two hands. The next thing he knew, gunfire was being directed at the car and the windows were shattering.

The driver, Khea, lost control of the car at the end of Wendell Street, where it crashed into a tree and came to rest against a fence at the intersection with Superior Street.[5] He and Alvarez got out of the car and started running. Alvarez said the last thing that he saw as he ran were his three friends in the car, who "looked like they [were] dead." After reaching Cranston Street, they went into an apartment building, where they asked a stranger to call the police. Meanwhile, Bun, still alert in the car, said that several people surrounded the car and started assaulting the passengers inside it, including him.[6] He said that he did not see who

same tragic events. *See Ouch v. Khea*, 963 A.2d 630 (R.I.2009).

**3.** Elizabeth Laposata, M.D., chief medical examiner for the State of Rhode Island, performed Say's autopsy. She testified that he died of extensive brain damage from a firearm injury to the back of the left side of his head.

**4.** Khea was driving; Say was in the front passenger seat; Ngim was in the middle of

the back seat, with Alvarez to his left, behind the driver, and Bun to his right, behind Say.

**5.** We recently held that Mr. Khea did not have a duty of care to protect his passengers from the intentional criminal acts of rival gang members. *Ouch*, 963 A.2d at 634.

**6.** Detective James Clift, who processed the car after it was towed to the police station, testified that damage to the car indicated that

these people were because he was "curled up," though he heard someone say, "Ah ha, your boy's dead." The people surrounding the car dispersed when the police arrived.

Various police officers reported to the scene, including Patrolman Robert Kells, Jr., Det. James Clift, and Det. Kerion O'Mara. Officer Kells, first to arrive at the scene, testified that he "observed several Asian males running from what was the crime scene." After observing the white car and realizing there were victims, he requested assistance and rescue units. He, and later Det. Clift, noticed two distinct groups of shell casings in the street; they believed that one group consisted of 9 mm casings and the other of 5.56 mm casings. One group was located across the driveway from 48 Wendell Street and the other, farther up and across the street.

Detective O'Mara testified that on January 4, 2002 he obtained arrest warrants for Sin and Ros, the suspected gunmen, as well as a search warrant for Sin's residence at 48 Wendell Street.[7] Both defendants were arrested at 48 Wendell Street, in a bedroom of Sin's first-floor apartment. Police also seized a black nylon rifle bag they found in the bedroom closet; the bag contained three magazines, or ammunition clips. Fingerprints found on one of the clips matched Sin's known print. An expert for the state testified that the rifle bag was manufactured as a case for an AR–15 or M–16 rifle.

Robert Hathaway, who was qualified as a firearms and toolmark expert, examined the spent shell casings found on Wendell Street and the magazines found in the rifle bag. He testified that twelve shell casings were 9 mm in caliber and could have been fired from a large handgun known as a Tech–9. Six shell casings, he said, were of a caliber referred to as either 5.56 or 223, which are compatible with an AR–15 or M–16 rifle. Mr. Hathaway determined that the magazines found in the rifle bag were designed to fit only size 223/5.56 mm shells. He could not ascertain whether any of the shell casings retrieved from Wendell Street had been fired, in fact, from any of those particular magazines. Finally, he testified that the lead fragments recovered from Say's body were too small and splintered to identify the caliber.

Various witnesses present on Wendell Street on January 1, 2002 had their own version of the events surrounding the shootings.[8] The state's primary witness, Samath Me, offered the most damaging testimony against defendants. Me testified that he was at Sin's New Year's Eve party that night and had walked there with three friends, Pheurt Phann, Rocky Sok, and Cha Leis Koak. When he stepped outside to have a cigarette, Me said that he saw Sin and Ros sitting in the rear hallway stairwell; he testified that Sin was cleaning a black rifle that looked to him like an AR–15, and Ros was holding a large handgun that looked like a Tech–9.

people had struck it: spider-web damage to the windshield, a large rock on the driver's seat, three shoe prints on the roof of the car, and six areas where projectiles had struck the vehicle.

7. In the affidavit supporting the arrest warrants, Det. O'Mara stated that "a cooperating witness whose name is known to the affiant" saw Sin and Ros fire upon the car and identified them in photographs. He attested that a second confidential informant placed both

Sin and Ros at the scene at the time of the shootings. In the search-warrant affidavit, Det. O'Mara averred that a witness told him that Sin possessed a rifle and Ros a handgun.

8. None of the witnesses who testified at trial said they had observed the shootings as they occurred. Instead, the witnesses from the parties testified that they heard gunshots and/or were informed about the shootings from someone else.

Me said that later that night, as he was leaving the party with Sok to buy more cigarettes, he observed Sin and Ros go into the backyard and fire their guns into the air. On the way back to the party, Me said that he and Sok heard a loud bang. He testified that, because they did not trust that loud noise, they decided not to return to the party. Me admitted that in an earlier statement given to the police on January 3, 2002, he stated that on their walk back to the party they encountered Phann, who told them that Sin and Ros had shot at a car. At trial, Me denied that this conversation took place.[9] Sok testified that they had encountered Phann and that he told them that there had been a shooting, but not that he had disclosed who the shooters were.

Other witness testimony at trial differed from Me's account in several respects. First, Cha Leis Koak testified that he did not go with Samath Me to the party at 48 Wendell Street that night. He asserted that he did not go to the party at all and had stayed home with his family and girlfriend on New Year's Eve. His father also testified that his son was at home that night. Second, no other witness testified to seeing Sin or Ros in the rear hallway stairwell with guns. Rocky Sok testified

that although he was at the party, he never went outside to share a cigarette with Me and did not see Sin or Ros with guns—neither in the hallway, nor in the backyard. Sok did confirm, however, that he left the party at some point to buy cigarettes with Me. Bounma Thammavongsa, a friend of Sin's and his uncle's girlfriend, testified that, close to midnight, she spent time talking with other people in the rear hallway during the party, but she never saw Sin or Ros there. Pheurt Phann said that he spent considerable time in the hallway talking to a girl, but he never saw anyone with guns. Third, although Me testified that he specifically recalled there being a light on in the hallway, five other witnesses, including defendant Ros, said that there was no light in the hallway. Chanda Sin, Sin's sister, who lived at 48 Wendell Street at the time of the party, testified that the rear hallway light never had worked. Thammavongsa testified that there was no light on in the hallway, but there was enough light to see other people. Fourth, Me testified to giving various oral and written statements to the police about this matter throughout 2002 and 2003. Detective Michael Sweeney, however, testified that he did not have formal contact with Me between January

<hr>

9. At trial, defense counsel attempted to expose Samath Me's potential bias by noting that he was testifying on behalf of the prosecution in exchange for leniency with his own legal matters. Samath Me and Pheurt Phann, along with Phann's brother, were detained on vandalism charges on January 2, 2002. Me's legal problems were exacerbated by the fact that he is not a United States citizen. The next day, Me and Phann agreed to give oral statements about what occurred on New Year's Eve. The vandalism charges against Me and issues concerning Me's immigration status were "resolved."

Although he was subpoenaed to testify at trial on October 18, 2004, Me did not appear on the date summoned. He was arrested on October 22, 2004, and held until October 25,

2004. The state released him, despite having outstanding warrants against him for pending criminal charges. Me testified that while he was in custody from October 22 through October 25, 2004, police and prosecutors spoke with him about his outstanding warrants and helped prepare him for his trial testimony. It appears that before Me testified the prosecution resolved various outstanding warrants against him, but left others open until after he testified.

Me testified that he met with police and prosecutors at least two or three times before the start of trial to prepare his testimony. He admitted that he refused to speak to either defense attorney before trial about his expected testimony, even though he was "everyone's witness."

2002 and September 2004. The prosecution informed the court that it possessed no signed statements by Me. Lastly, despite Me's testimony that Sin and Ros fired their guns in the backyard that night, the police did not find shell casings there during their investigation.

Although no one testified at trial to observing the shootings, two witnesses gave first-hand accounts of the shootings to police in earlier statements and during grand jury proceedings. Both denied the truth of their earlier statements at trial. Sophear Chum, a guest at Sin's party, testified that he was outside when he heard gunshots. He ducked down, and when he looked up, he saw a white car, which he knew belonged to Khea. He saw it speed down Wendell Street and crash. Chum testified that he initially tried to assist the passengers in the car, but then changed his mind and headed toward home. The police picked him up on his walk home and discovered blood on his pants and shoes. On January 1, 2002, Chum told police that he heard gunshots and saw a white car crash, but he did not mention either defendant. However, on January 5, 2002, after Chum was arrested and charged with assaulting passengers in the white car, he gave a statement to the police that he saw Sin standing in the street and shooting. He subsequently told the grand jury that he saw two shooters outside 48 Wendell Street, one of whom was dressed in a white shirt, dark jeans, and a hat. Nonetheless, at trial, and during his grand jury testimony, Chum testified that he never

saw the persons who did the shooting, and that the police and prosecutors had pressured him into saying that Sin was one of the shooters. According to Chum, Det. O'Mara told him that if he did not assert that Sin was one of the shooters, the state would charge him with the shootings and "make [him] do life."

Pheurt Phann, another guest at the party that night, likewise denied at trial seeing anyone perform the shootings on January 1, 2002, despite prior inconsistent statements.[10] At trial, he testified that at some point during the night he heard gunshots, which scared him, so he decided to go home. He testified that he did not see any guns, did not know where the gunshots came from, and did not know where either defendant was located when he heard the shots. He said he encountered Me and Sok on his way home and that he told them not to go back to the party because it had ended after the shootings. Phann acknowledged, however, that on January 3, 2002, after being arrested on vandalism charges, he gave a statement to police saying that he saw Sin and Ros shooting at a white car.[11] He also was impeached with grand jury testimony in which he accused Sin and Ros of being the shooters.[12] During trial, however, he said that, on both prior occasions, the police told him what to say. He denied telling the police that he observed defendants shoot at the white car, or that he told Me or Sok, or anyone else, who did the shooting. He further denied making a statement to Det. Sweeney on March 16, 2004,

10. Phann testified via a Cambodian interpreter. Phann said he did not have the aid of a translator when he was questioned by the police, nor when he testified before the grand jury.

11. This statement was given a day after Phann was arrested, on January 2, 2002, with his brother and Samath Me. See note 9, supra. Detective O'Mara testified that he never asked

Phann to read his own statement "because he had trouble reading," but he read it back to him.

12. The state played a tape-recording of Phann's grand jury testimony for the jury and gave a copy of the grand jury testimony to the jurors.

that an unknown person approached him and told him not to "snitch." He did acknowledge, however, that on that date he informed the prosecutors and police that he no longer wished to be involved in the case and would not testify.

The defendants presented several witnesses who testified that defendants were intoxicated that night. Bertram Ware testified that sometime after 11:15 p.m. that night he saw Ros sitting on a sofa, apparently drunk, having trouble holding up his head. David Puoy testified that he was looking for Ros during the party when someone informed him that Ros had "passed out." Jason Irizarry said that when he left the party around 11 or 11:30 p.m., Ros was inebriated. Bounma Thammavongsa gave a similar account about Sin. She testified that around 11:15 or 11:30 p.m. she saw him heading toward his bedroom. She said that he appeared to be drunk, was having difficulty walking, and was being assisted by a female.

Arun Ros testified at trial in his own defense. He said that he attended Sin's New Year's Eve party. He went early to help set up, acted as disc jockey, and helped pass out drinks. He said he wore black jeans, a black and gray Raiders jersey, and a gray fleece. Ros testified that he did not see Samath Me, Rocky Sok, Pheurt Phann, or Cha Leis Koak at the party. He believed that he drank more than six twelve-or sixteen-ounce cups of beer that night.

Ros testified that he was in the basement when he heard someone—he did not know who—say there had been a shooting. He said he then followed everyone out of the basement and to the driveway, where he met his friend Samath Vann, who gave him a ride home. While driving away, he saw a white car, but he did not observe

much about it, nor did he see it crash. He said that, because of his drinking, he could not see well. Ros told the jury that he did not have a gun at the party; he never sat on the rear hallway stairwell cleaning a gun; he did not shoot at any car nor fire any gun at all that night.

The state also introduced into evidence a compact disc containing seventy-two tape-recorded telephone conversations to which Sin was a party while at the Adult Correctional Institutions. The compact disc was prepared by Raymond Lauson of the Department of Corrections, Special Investigations Unit.[13] The taped conversations were partly in English, partly in Cambodian. Mike Chea, a Cambodian interpreter from the International Institute, testified about the content of one of those conversations, specifically a conversation between Sin, his mother, and his sister. Chea testified that, in that conversation, Sin told his mother to "buy alcohol, * * * wear a rubber glove, * * * wash the gun, the thing * * * wash it all. * * * [M]ake sure that that guy does not tell anyone where that thing is." He also told his mother to tell someone "that that thing is very important to me. If they find that, my life is over." Finally, he told his mother not to sell "the thing" and that he would take care of it when he got out.

The state contended and charged that defendants Sin and Ros came from the party at 48 Wendell Street, that each defendant was carrying a gun, and that each defendant fired at the car driven by Khea. A grand jury issued an indictment on May 28, 2002, jointly charging Sin and Ros with nine offenses, including murder of Heang Ly Say (count 1); conspiracy to commit murder (count 2); assault with intent to murder Thanaroeuth Ngim (count 3); assault with a dangerous weapon upon Angel

---

13. All prisoners are informed that all calls, except those to their attorneys, are recorded.

Alvarez (count 4), Perry Bun (count 5), Khan Khea (count 6), and Thanaroeuth Ngim (count 7); committing a crime of violence with a firearm, death resulting (count 8); and committing a crime of violence with a firearm, injury resulting (count 9).

After pretrial motion hearings and jury selection, trial of defendants commenced on October 29, 2004, and on December 6, 2004, the jury returned guilty verdicts against both defendants on all counts. On March 30, 2005, the trial justice heard argument on Ros's motion for new trial; Sin previously had passed his motion for new trial, while preserving legal issues raised at trial. The motion for new trial was denied on April 1, 2005. On June 14, 2005, defendants were sentenced to like terms as follows: mandatory life imprisonment for murder; concurrent terms of ten years imprisonment for conspiracy to commit murder; consecutive terms of twenty years imprisonment for assault with intent to murder; concurrent terms of twenty years imprisonment for four counts of assault with a dangerous weapon; and mandatory consecutive life imprisonment for committing crimes of violence with a firearm. Both defendants filed notices of appeal.[14]

We discuss additional facts in the context of the issues raised on appeal.

## II

## Discussion

### A

### Judgment of Acquittal

The defendants argue that the trial justice erroneously denied their motions for judgment of acquittal on all charges. The state contends that the trial justice properly denied the motions for judgment of acquittal because the evidence, viewed in the light most favorable to the state, supported the criminal charges. The parties' arguments with respect to the various criminal charges are detailed below.

### 1. Standard of Review

■ Under Rule 29 of the Superior Court Rules of Criminal Procedure, a judgment of acquittal shall be entered when the evidence is not legally sufficient to sustain a conviction. "Whenever this Court reviews the denial of a motion for judgment of acquittal, we apply the same standard as that applied by the trial justice; namely, we 'must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Caba*, 887 A.2d 370, 372 (R.I.2005) (quoting *State v. Higham*, 865 A.2d 1040, 1048 (R.I. 2004)). The court is required to evaluate "only that evidence that the prosecution claims is capable of supporting proof of guilt beyond a reasonable doubt." *Id.* (quoting *State v. Andrades*, 725 A.2d 262, 263 (R.I.1999)). "If that examination reveals sufficient evidence to warrant a jury verdict of guilt beyond a reasonable doubt," the trial justice's denial of the motion should be upheld. *State v. Oliveira*, 882 A.2d 1097, 1108–09 (R.I.2005) (quoting *State v. Bulgin*, 845 A.2d 308, 311 (R.I. 2004)).

### 2. Murder Charge

The defendants argue that there was insufficient evidence to support a conviction of first-degree murder, even when viewed in the light most favorable to the

---

14. Although defendants Sin and Ros filed notices of appeal before judgment of conviction was entered on October 3, 2005, we treat the premature appeals as if they had been filed properly. *State v. Hesford*, 900 A.2d 1194, 1197 n. 3 (R.I.2006).

state, because the state presented evidence of, at most, a sudden, impulsive shooting and not the premeditated killing required for first-degree murder. Ros also argues, independently, that there was not even sufficient evidence to support any lesser-included murder charge against him because the only evidence identifying him as a shooter in this case consisted of the prior inconsistent statements made by Pheurt Phann. The state counters, first, that Phann's prior inconsistent statements identifying Ros as one of the shooters were sufficiently corroborated by the in-court testimony of other witnesses at trial. Next, concerning both defendants, the state argues that the amount of time it took for the shooters to run out onto the street and fire a "fusillade of shots" supports a finding of premeditation.

### a. Prior Inconsistent Statements as Evidence

First, we address Ros's argument that the evidence against him could not support a murder conviction because it did not adequately identify him as a shooter. To support his contention that the trial justice should have granted his motion for judgment of acquittal, Ros relies upon Rule 801 of the Rhode Island Rules of Evidence.

Rule 801(d)(1)(A) provides that a prior inconsistent statement of a witness is not hearsay and, thus, is admissible as substantive evidence, if the declarant testifies and is subject to cross-examination concerning the statement. This rule repre-

sents a departure from the traditional rule that prior inconsistent statements were admissible only as impeachment evidence. *See State v. Espinal,* 943 A.2d 1052, 1059 (R.I.2008). Ros emphasizes that the Advisory Committee's Note to Rule 801 distinguishes between the question of substantive admissibility and the sufficiency, or weight, of the evidence.[15] In recognizing this principle, we previously have observed that the decision of whether to admit prior inconsistent statements at trial as substantive evidence "is separate and distinct from the determination as to whether or not the statement or statements *suffice in and of themselves* as the basis upon which the trier of fact may properly render a verdict." *Espinal,* 943 A.2d at 1060.

In *Espinal,* 943 A.2d at 1060–61, we declined to decide whether a prior inconsistent statement, without more, was sufficient to support a criminal conviction because we determined that there was sufficient corroborative evidence in that case to sustain a conviction. We reach a similar conclusion in this case.

▪ The evidence presented at trial is consistent with the theory that there were two shooters. Police investigators discovered two distinct groups of shell casings on Wendell Street, twelve of which were 9 mm shells and six of which were 223 or 5.56 mm shells. Although all the surviving occupants of the white Acura testified to seeing only one shooter, they offered two distinct descriptions: Ngim saw an Asian

---

**15.** The note states:

"It is important to distinguish between the substantive admissibility of prior inconsistent statements and their sufficiency (or weight). For example, even though *admissible* substantively, a prior inconsistent statement may not be *sufficient* in itself to sustain a conviction. Because of the elevated burden of proof in criminal cases, a trial court may properly direct a verdict of acquittal where a prior inconsistent statement

is the only source of support for the central allegations of the charge. * * * The important point is not to confuse the decision to *admit* such statements substantively with their *sufficiency* to establish the point for which they are offered." R.I. R. Evid. 801, Advisory Committee's Note (citing *United States v. Orrico,* 599 F.2d 113 (6th Cir.1979) *and State v. White Water,* 634 P.2d 636 (Mont.1981)).

man in dark clothes while Alvarez and Khan saw an Asian man wearing white, which suggests that two shooters were present, but that no occupant saw both. Additionally, Sophear Chum, another guest at the party that night, told the grand jury that he observed two shooters, one being Sin, though he denied observing the shooting at trial.

From the evidence that the state offered at trial, the jury reasonably could have inferred that the second shooter was Ros. Samath Me told the jury that he saw both defendants in the hallway stairwell cleaning firearms earlier that night. He stated that Sin was holding what looked like an AR–15 (which an expert testified fires 223/5.56 mm shells), and Ros was holding what looked like a Tech–9 (which an expert testified fires 9 mm shells). Me also told the jury that, as he was leaving the party that night to buy more cigarettes, a little before midnight, he observed Sin and Ros go into the backyard and fire their guns into the air. Finally, Me told the police in an earlier statement that on his way back to the party he ran into Phann, who told him not to return because there had been a shooting and that Sin and Ros were the shooters—though at trial Me denied that this conversation had taken place.

■ We reiterate that, in the context of this issue on appeal, we are required to evaluate the evidence in the light most favorable to the state. *See Caba,* 887 A.2d at 372. When reviewing the denial of a motion for judgment of acquittal, we treat the state's witnesses as fully credible and make reasonable inferences of guilt from the evidence presented. *Id.* We recognize the potential witness bias and contradictory testimony that defense counsel exposed in this case. It is our opinion, however, in

light of the standard of review, that the evidence corroborating Phann's prior inconsistent statements, and the reasonable inferences capable of being drawn therefrom, were sufficient to support Ros's murder conviction.

### b. First–Degree Murder

■ Next, we address Sin's argument and Ros's alternative argument that the state did not establish the required elements of first-degree murder in this case. In Rhode Island, murder is "[t]he unlawful killing of a human being with malice aforethought." G.L.1956 § 11–23–1. First-degree murder is defined as "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing * * * or perpetrated from premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed." [16] *Id.* Second-degree murder is defined as "[a]ny other murder." *Id.* In order to prove first-degree murder, the state must show that the accused formed an intent to kill, thought about or deliberated on that intent to kill for some appreciable length of time (premeditation), and then engaged in homicidal conduct. *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I. 1994); *see State v. Gillespie,* 960 A.2d 969, 974–77 (R.I.2008). We recently and explicitly made clear that "the distinction between first-degree and momentary-intent-based second-degree murder is the *duration* of the defendant's intent to kill." *Gillespie,* 960 A.2d at 976–77. First-degree murder requires that the defendant acted with premeditation—meaning, "the defendant harbored a more-than-momentary in-

---

**16.** Felony murder, not at issue in this case, is also first-degree murder in Rhode Island. *See* G.L.1956 § 11–23–1.

tent to kill prior to committing the homicide." *Id.* at 977.[17]

The defendants rely on *State v. Iovino*, 524 A.2d 556, 557, 558 (R.I.1987), in which this Court held that the defendant committed the offense of second-degree murder when he fired a "fusillade of shots" into the walls and interior of the West Warwick police station, thereby killing a civilian standing at the front counter. The Court concluded that the defendant's conduct amounted to "wanton recklessness" because he had every reason to believe the building was occupied, and that wanton recklessness satisfies the element of malice necessary for second-degree murder. *Id.* at 558; *see also State v. McGranahan*, 415 A.2d 1298, 1301 (R.I.1980). The defendants argue that, as in *Iovino*, a volley of shots was fired, and there was no evidence in this case of any motive or preconceived plan—thus, they contend that the evidence supports, at most, a conviction of second-degree murder based on wanton recklessness.

■ The defendants' reliance on *Iovino* is misplaced. Although this case certainly involves a "fusillade of shots" similar to that in *Iovino*, there is evidence of intent to kill and premeditation sufficient to withstand a motion for judgment of acquittal on first-degree murder charges. A specific intent to kill can be inferred from the nature of the killing. *See Ford v. State*, 330 Md. 682, ·625 A.2d 984, 1001 (1993), *superseded by statute on other grounds as explained in Robinson v. State*, 353 Md. 683, 728 A.2d 698, 702–04 (1999) ("Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone."). The fact-finder reasonably may infer a specific intent to kill from the use of a deadly weapon directed at others. *See State v. Ramirez*, 786 A.2d 368, 375 (R.I.2001) (use of a gun permits reasonable inferences to be drawn that the "defendant formed an intent to murder the victim"); *State v. Barrett*, 768 A.2d 929, 944 (R.I. 2001) (from the use of a gun, "a reasonable inference may be drawn * * * that [the defendant] formed an intent to kill") (quoting *State v. Mattatall*, 603 A.2d 1098, 1106 (R.I.1992)); *State v. Fournier*, 448 A.2d 1230, 1233 (R.I.1982) (intent to kill victim may be inferred from firing a deadly weapon at vital part of victim's body).

■ Although an intent to kill, alone, is not enough to establish first-degree murder, there is also sufficient evidence of premeditation on the part of defendants. A preconceived plan and prior contemplation on the part of defendants may be inferred from evidence that defendants cleaned and practiced firing their guns not long before the shootings occurred and from the fact that two shooters simultaneously performed identical actions—going into the street and firing repeatedly at a particular car. This certainly is enough to establish that "defendant[s] harbored a more-than-momentary intent to kill prior to committing the homicide." *Gillespie*, 960 A.2d at 977. On a review of a motion for judgment of acquittal, viewing the evi-

---

17. In *State v. Gillespie*, 960 A.2d 969, 977 (R.I.2008), we clarified confusing case precedent and explicitly held that "premeditation is not a requirement of malice aforethought and thus is not an element of second-degree murder." We noted that there are three possible theories of second-degree murder, each grounded in the common-law conception of malice aforethought: (1) intent-to-kill, wanton recklessness, and felony murder. *Id.* at 974–77. First-degree murder is reserved, statutorily, for those, arguably, more culpable intentional killings (or killings committed during specifically enumerated felonies). *See id.; see also* § 11–23–1.

dence in the light most favorable to the state, we conclude that the evidence is sufficient to sustain defendants' first-degree murder convictions.

### 3. Conspiracy

The defendants argue that there was insufficient evidence to support a conviction of conspiracy to commit murder, even when viewed in the light most favorable to the state, because, like the argument above, the state presented evidence of, at most, a sudden, impulsive shooting. Specifically, defendants argue that "[t]here was no evidence of any conversation indicating a plan to shoot at the car—or a plan to shoot at anything for that matter." The defendants argue that if the evidence does not support a charge of first-degree murder, then it is both factually and legally impossible to conspire to commit the crime of second-degree murder. The state contends that the circumstances surrounding the shooting, particularly the "simultaneous" nature of the shootings, support the existence of a conspiracy.

■ The crime of conspiracy is an agreement between "two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *State v. Graham,* 941 A.2d 848, 863 (R.I.2008) (quoting *State v. Mastracchio,* 612 A.2d 698, 706 (R.I.1992)). Although a common agreement is the keystone of the crime of conspiracy, this Court "has recognized that it is usually very difficult to prove in complete detail the explicit terms of an agreement." *State v. Oliveira,* 774 A.2d 893, 919 (R.I.2001). "Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances, and actions of the parties." *State v. Barton,* 427 A.2d 1311, 1313 (R.I. 1981).

■ In denying defendant's motion for judgment of acquittal on the charge of conspiracy, the trial justice recited the following facts:

> "Based upon the fact that these defendants, according to the testimony in this case, were in the hallway with the weapons, that they acted in concert running out of that driveway, they both fired into the vehicle, the Court finds that the conspiracy was certainly established. * * * [Defense counsel] sets out in his memorandum the very elements that the Court is basing its decision on regarding conspiracy; that the defendants were friends; they attended the party together; they were in possession of guns in the hallway together, in spite of the fact there was no conversation between them at that time; they fired the guns in the [air] in the backyard; they ran out of that driveway and fired into the car. All those facts are consistent with an agreement to violate the law."

We agree with the trial justice that the simultaneous nature of the shootings undermines an argument that it was a spontaneous event. Evaluating the evidence in the light most favorable to the state, the jury could have inferred an implicit agreement between defendants sufficient to sustain defendants' conspiracy convictions.

### 4. Assault with Intent to Commit Murder

With respect to the argument that the trial justice should have acquitted defendants of assault with intent to commit murder, defendants rely on essentially the same argument that they made with respect to acquittal of the first-degree murder charge. In this case, the jury was instructed only on the crime of assault with intent to commit first-degree murder of Thanaroeuth Ngim. Specifically, the trial justice informed the jury that the definition of murder that had been provided as to count 1 applied to this charge. The

defendants argue that because the evidence does not support a first-degree murder charge, the jury should not have been permitted to find defendants guilty of assault with intent to commit first-degree murder. Ros argues, additionally, that because the evidence is insufficient to convict him of any degree of murder, the jury could not have found him guilty of assault with intent to commit murder.

■ We rely on the conclusions reached above. The crime of assault requires a specific intent to bring about a particular consequence. *See* 21 Am.Jur.2d *Criminal Law* § 119 (2008). A specific intent to kill can be inferred from use of a deadly weapon. *See Ramirez,* 786 A.2d at 375. Premeditation can be inferred from the facts we detailed above. Because the evidence is sufficient to support defendants' murder convictions on review of a motion for judgment of acquittal, it is sufficient to support a charge of assault with intent to commit murder.

### 5. Assault with a Dangerous Weapon

■ Ros argues, independently, that the lack of sufficient evidence linking him to the shootings, as articulated in his argument concerning the murder charge, above, also requires an acquittal of the four assault charges against him. We determined, *supra,* that there is sufficient evidence linking Ros to the shootings to withstand a motion for judgment of acquittal. Accordingly, we reject this argument.

### 6. Discharging a Weapon While Committing a Crime of Violence

The defendants finally argue that the singular-person language of G.L.1956 § 11–47–3.2(b)(3) ("no person" and "every person") requires the state to prove that a *particular* defendant *personally* discharged the firearm resulting in death or injury. They maintain that the statute does not support conviction on a theory of vicarious liability. Because the state was unable to prove which firearm, or which defendant, caused the death of Heang Ly Say and the permanent incapacity of Thanaroeuth Ngim, it could not sustain convictions of either defendant on either of these counts. The state maintains that the wording of the firearm statute does not preclude vicarious liability.

The relevant statute provides, in pertinent part:

> **"Using a firearm when committing a crime of violence.**—(a) No person shall use a firearm while committing or attempting to commit a crime of violence. * * *

> "(b) Every person who, while committing an offense violating subsection (a) of this section, discharges a firearm shall be guilty of a felony and be imprisoned as follows:

> " * * *

> "(3) Life * * * if the death or permanent incapacity of any person (other than the person convicted) results from the discharge of the firearm." Section 11–47–3.2.

■ Rhode Island adheres to the *Pinkerton* theory of vicarious liability, which holds a coconspirator criminally liable for the actions of another coconspirator if those actions were committed in furtherance of an existing conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 645, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) (each defendant could be found guilty of the substantive offenses charged "if it was found at the time those offenses were committed [defendants] were parties to an unlawful conspiracy and the substantive offenses charged were in fact committed in furtherance of it"); *State v. Day,* 925 A.2d

962, 984 (R.I.2007); *see also State v. Harnois*, 853 A.2d 1249, 1256 (R.I.2004).[18]

■ Here, the state charged defendants with conspiracy to commit murder and with a number of substantive crimes. In his instructions to the jury on the firearm charges, the trial justice incorporated by reference the earlier instructions relating to murder and conspiracy to commit murder. There was no need for the state to charge numerous separate substantive conspiracy charges in relation to each count in the indictment for a theory of vicarious liability to attach. *See United States v. Sanchez*, 917 F.2d 607, 611–12 (1st Cir.1990) ("every court to consider the matter has held that 'the individual substantive counts need not make reference to co-conspirator liability in order for the jury to be so instructed'") (quoting *United States v. Thirion*, 813 F.2d 146, 152 (8th Cir.1987)).

We disagree with defendants' argument that vicarious liability does not apply to the firearm statute. If we were to adhere to defendants' logic, and hold that use of singular pronouns in a criminal statute prevented the application of vicarious liability, there could hardly be vicarious liability for any crime. As the state points out in its brief, many of our substantive criminal statutes make use of the singular pronoun. *See, e.g.,* G.L.1956 § 11–8–1, entitled "Burglary" ("*Every person* who shall commit burglary shall be imprisoned for life or for any term not less than five (5) years) (emphasis added)"; G.L.1956 § 11–13–1, entitled "Sale, use or possession of fireworks" ("*No person* shall offer for sale at retail or at wholesale, shall possess or have under his or her control, use or ex-

plode * * * any fireworks") (emphasis added); G.L.1956 § 11–26–1, entitled "Kidnapping" ("*Whoever*, without lawful authority, forcibly or secretly confines or imprisons another person within this state against his or her will * * *") (emphasis added); G.L.1956 § 11–16–5, entitled "Poisoning with intent to kill" ("*Every person* who shall mingle any poison with any food, drink, or medicine, with intent to kill or injure any person * * *") (emphasis added). Moreover, the General Assembly already has provided that in interpreting a state statute, "[e]very word importing the singular number only may be construed to extend to and to include the plural number also, and every word importing the plural number only may be construed to extend to and to embrace the singular number also." G.L.1956 § 43–3–4.

Indeed, this Court already has upheld a criminal conviction for discharging a firearm while committing a crime of violence, death resulting, under a theory of vicarious liability. *See Graham,* 941 A.2d at 852–53, 856–57. Thus, we find no merit in defendants' contention that the wording of the firearm statute precludes application of a theory of vicarious liability.

## B

### Jury Instructions

The defendants argue that the trial justice committed reversible error in overruling their objections to the jury instructions and verdict form. The state maintains that the jury instructions adequately informed the jurors of the applicable law. We elaborate upon the parties' arguments

---

18. Indeed, Rhode Island recognized, in *State v. Miller*, 52 R.I. 440, 445–46, 161 A. 222, 225 (1932), a theory of vicarious liability thirteen years before the United States Supreme Court decided *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). This Court reaffirmed the rule of *Miller* and *Pinkerton* in *State v. Barton,* 424 A.2d 1033, 1038 (R.I.1981).

in the context of the various criminal charges.

### 1. Standard of Review

 We undergo a review of jury instructions on a *de novo* basis. *Graham,* 941 A.2d at 855 (citing *State v. Imbruglia,* 913 A.2d 1022, 1031 (R.I.2007)). It is well established that, "[o]n review, we examine [jury] instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them." *State v. Ibrahim,* 862 A.2d 787, 796 (R.I.2004) (quoting *State v. Kittell,* 847 A.2d 845, 849 (R.I.2004)). "[T]his Court will not examine a single sentence apart from the rest of the instructions, but rather 'the challenged portions must be examined in the context in which they were rendered.'" *Id.* Pursuant to G.L.1956 § 8-2-38, "we determine whether the jury charge 'sufficiently addresses the requested instructions and correctly states the applicable law.'" *Graham,* 941 A.2d at 855 (quoting *State v. Mastracchio,* 546 A.2d 165, 173 (R.I.1988)). "[A]n incorrect charge warrants reversal only if a jury could have been misled to the prejudice of the complaining party." *Id.* (citing *Anter v. Ambeault,* 104 R.I. 496, 501, 245 A.2d 137, 139 (1968)).

### 2. Murder

The defendants argue that the trial justice erred in instructing the jury on the crime of murder in two respects. First, they argue that the trial justice erroneously failed to define the term "deliberation" as part of the instruction on the crime of first-degree murder. Second, they assert that the trial justice committed reversible error when he refused to instruct the jury on the lesser-included offense of second-degree murder because the evidence demanded such an instruction.

### a. Deliberation in First–Degree Murder

In his instructions to the jury on first-degree murder, the trial justice did not include a separate and distinct definition of the term "deliberation."[19] The murder statute in Rhode Island defines murder in the first degree as a "willful, deliberate, malicious, and premeditated killing."[20]

---

**19.** The first-degree murder instruction provided, in pertinent part, as follows:

"In order for you to convict the defendants of first degree murder, you must find beyond a reasonable doubt that each of the following elements exists:

"One; that the defendants willfully caused the death of Say Heang Lee, also known as Heang Ly Say; two, that the defendants acted with malice aforethought; and that third element is that the defendants acted with premeditation.

"Let me define some of these terms for you. As to the word 'willfully,' an act is done willfully if it is done voluntarily and intentionally and not by mistake or accident.

"The terms 'maliciously' and 'with premeditation' mean deliberate and voluntary actions resulting from the defendants' prior consideration of the act itself. Such a prior consideration, however, must have existed

in the minds of the defendants for more than simply a moment's duration. In other words, the defendants must have already fixed in their minds for more than a moment an intention to kill before the fatal act occurred; and that conscious fixation must have been more than just a fleeting or momentary thought."

**20.** In almost all jurisdictions that divide the crime of murder into degrees, first-degree murder includes the "willful, deliberate and premeditated" killing of another. Joshua Dressler, *Understanding Criminal Law,* § 31.03 at 508 (3d ed.2001); *see* § 11–23–1. Although the term "willful" commonly is understood in this context simply to mean specific intent to kill, courts have struggled in giving meaningful definitions to the terms "premeditation" and "deliberation." Dressler, § 31.03 at 508; Wayne R. LaFave, *Criminal Law,* § 14.7 at 766 (4th ed.2003); *see, e.g., Nika v. State,* 198 P.3d 839, 850 (Nev.

Section 11–23–1. As articulated by criminal law scholars, to "deliberate" is " 'to measure and evaluate the major facets of a choice or problem.' " Joshua Dressler, *Understanding Criminal Law*, § 31.03 at 509 (3d ed.2001). Deliberation is a thought process that considers the reasons for and against a possible course of action, taking into account the potential consequences without the disturbance of strong emotion, such as excitement or passion. *See id.* Many courts have explained deliberation as insinuating a "cool purpose" and denoting the "cold-blooded" killer. *Id.; see, e.g., Strong v. State*, 263 S.W.3d 636, 649 (Mo.2008) (explaining that state statute defines deliberation "as a cool reflection for any length of time no matter how brief); *State v. Taylor*, 362 N.C. 514, 669 S.E.2d 239, 256 (2008) ("[d]eliberation means an intent to kill, carried out in a cool state of blood"); *State v. Brown*, 836 S.W.2d 530, 538 (Tenn.1992) (opining that the element of deliberation satisfies the "cool purpose contemplated by the [state murder] statute"), *superseded by statute*, 1995 Tenn. Pub. Acts page no. 801–02 (defining first-degree murder without the element of deliberation).

Nationally, courts have diverged in their treatment of the term "deliberate" in first-degree murder jurisprudence. Some courts treat deliberation and premeditation as distinct elements. *See, e.g., Nika v. State*, 198 P.3d 839, 847 (2008) (reaffirming previous holding that "deliberation" and "premeditation" are distinct elements of first-degree murder and reiterating the abandonment of those cases that reduced "deliberation" to a synonym of "premeditation"); *State v. Bush*, 942 S.W.2d 489, 501

(Tenn.1997) (reiterating that "premeditation and deliberation are not synonymous terms," and "premeditation requires proof of a previous intent to kill, while deliberation requires proof of a 'cool purpose' that includes some period of reflection during which the mind is free from passion and excitement"). Some courts focus on the element of premeditation and ignore or under-emphasize the element of deliberation, and vice versa. *Compare Mattern v. State*, 151 P.3d 1116, 1128 (Wyo.2007) (upholding jury instructions that encapsulated the "idea of deliberation" where trial judge charged that "premeditated" means "the defendant thought about and considered the idea of killing before the act" and "requires an interval sufficient to form the intent to kill before the commission of the act") *and Manley v. State*, 918 A.2d 321, 327 (Del.2007) ("murder is premeditated if the 'defendant thought about it, considered it or deliberated about it beforehand' ") *with People v. Whisenhunt*, 44 Cal.4th 174, 79 Cal.Rptr.3d 125, 186 P.3d 496, 528 n. 12 (2008) ("The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[s] an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree."). Some courts treat the two terms as one element. *See, e.g., State v. Henson*, 287 Kan. 574, 197 P.3d 456, 460 (2008) (defining "premeditation" as a " 'state of mind' relating to a person's reasons and motives for acting" or as " 'the time of reflection or deliberation' "); *Commonwealth v. Perkins*, 450

2008) ("jurisdictions differ in their treatment of the terms 'willful,' 'premeditated,' and 'deliberate' for first-degree murder"). The most commonly used definition of these elements is confusing and unclear: "Perhaps the best that can be said of 'deliberation' is that it

requires a cool mind that is capable of reflection, and of 'premeditation' that it requires that the one with the cool mind did in fact reflect, at least for a short period of time before his act of killing." LaFave, § 14.7 at 766–67.

Mass. 834, 883 N.E.2d 230, 238 (2008) (following a theory of "deliberate premeditation"); *State v. Gregory,* 158 Wash.2d 759, 147 P.3d 1201, 1232 (2006) (although statute defined the premeditation necessary for first-degree murder as " 'involv[ing] more than a moment in point of time,' " the court augmented this definition by requiring " 'deliberate formation of and reflection upon the intent to take a human life [that] involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short' ") (bracket in original).

This disparate treatment stems from the fact that these two elements are not the same, but they do overlap. It takes time to deliberate. Thus, one cannot deliberate unless one premeditates. However, it is possible to premeditate without deliberating. Whereas "premeditation" speaks to the *quantity* of the reflection, best understood as the *amount of time* the killer considered the act of homicide before engaging in it, "deliberation" speaks to the *quality* of that reflection. The quality of the quantity of time a person spends thinking about the act of murder before conducting it may not always be a calm and careful process of reflection.

Despite the fact that the murder statute mentions deliberation in the definition of first-degree murder, *see* § 11–23–1, the question whether deliberation is an independent element of first-degree murder in Rhode Island has never been judicially answered. This Court has never clearly explained the status of the element of deliberation in first-degree murder, nor has the term "deliberation" ever been defined. A number of our decisions ignore the term entirely. *See State v. Clark,* 423 A.2d 1151, 1161 (R.I.1980); *McGranahan,* 415 A.2d at 1301; *State v. Myers,* 115 R.I. 583, 590–91, 350 A.2d 611, 615 (1976); *State v.*

*Page,* 104 R.I. 323, 333–34, 244 A.2d 258, 263–64 (1968), *overruled on other grounds, State v. Johnson,* 119 R.I. 749, 770, 383 A.2d 1012, 1023 (1978); *State v. Crough,* 89 R.I. 338, 352–53, 152 A.2d 644, 652 (1959); *State v. Prescott,* 70 R.I. 403, 417–19, 40 A.2d 721, 728–29 (1944). Most decisions simply mention deliberation in passing, usually while reciting the statute, but the term is not elaborated upon in any meaningful way. *See State v. Parkhurst,* 706 A.2d 412, 421 (R.I.1998); *State v. Figueras,* 644 A.2d 291, 294 (R.I.1994); *Mattatall,* 603 A.2d at 1106; *State v. Amazeen,* 526 A.2d 1268, 1271 (R.I.1987); *State v. Hathaway,* 52 R.I. 492, 501–02, 161 A. 366, 369–70 (1932).

The overall trend in the case law has been to consolidate the elements of premeditation and deliberation into a single element called "premeditation." *See Gillespie,* 960 A.2d at 974–77 ("the distinction between first-degree and momentary-intent-based second-degree murder is the duration of the defendant's intent to kill"); *Clark,* 423 A.2d at 1161 ("we have always stressed that the determinative factor differentiating first-degree from second-degree murder is the time lag between the formation of the homicidal intent and the killing itself"); *Myers,* 115 R.I. at 591, 350 A.2d at 615.

Only once, almost eighty years after the enactment of the murder statute, has this Court mentioned the concept of *coolness* embodied by the element of deliberation. In *State v. Diaz,* 654 A.2d 1195 (R.I.1995), this Court quoted a treatise for the proposition that, "[p]erhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection, and of 'premeditation' that it requires that the one with the cool mind did in fact reflect." *Id.* at 1201 (quoting Wayne R. Lafave & Austin W. Scott, Jr., *Criminal Law,* § 7.7(a) at 642–43 (2d ed.1986)). The deci-

sion does not explain this language further, nor have we repeated this language in any subsequent decisions.[21] *See id.*

In essence, the term "deliberation" has been absorbed by the element of premeditation, and what remains of deliberation is that it is a characteristic defining the timing aspect of premeditation. We are unaware of a single decision of this Court that carefully analyzes whether a defendant weighed the reasons for or against a possible course of action without the disturbance of strong emotion. Instead, the case law has focused on the amount of time a given defendant thought about his future conduct, using the possibility of deliberation as a measuring instrument for determining whether there was sufficient premeditation to establish first-degree murder. The question may be whether there was more than a mere moment in which a defendant, having formed an intent to kill, could reflect on his intent to kill, but the law of Rhode Island has never required a separate finding that a defendant did, in fact, deliberate on that intent. *See Parkhurst,* 706 A.2d at 421; *Figueras,* 644 A.2d at 294; *Mattatall,* 603 A.2d at 1106; *Amazeen,* 526 A.2d at 1271; *Clark,* 423 A.2d at 1161; *Myers,* 115 R.I. at 590–91, 350 A.2d at 615; *Page,* 104 R.I. at 333–34, 244 A.2d at 263–64; *Crough,* 89 R.I. at 352–53, 152 A.2d at 652; *Prescott,* 70 R.I. at 417–20, 40 A.2d at 728–29; *Hathaway,* 52 R.I. at 501–02, 161 A. at 369–70.

Even those cases that give the term "deliberation" some of its own separate treatment do so only as a qualifier for the element of premeditation. For example, in *Grabowski,* 644 A.2d at 1285, we held that "[a]n unlawful killing that is deliberate and premeditated distinguishes first-degree murder from murder in the second-degree."[22] We went on to conclude that first-degree murder "requires proof of premeditation of more than a momentary duration and proof of deliberation." *Id.* Nonetheless, the very next statement in the decision refers to the "conclusion that murder in the first degree requires *an additional element* distinct from murder in the second degree." *Id.* at 1286 (emphasis added). The fact that "element" is singular supports the notion that premeditation is the only additional element of first-degree murder and that proof of deliberation is simply a way to determine whether the defendant actually has premeditated.[23]

■ The conclusion that deliberation is not a separate and distinct element of first-degree murder in Rhode Island is buttressed by our decision in *State v. Sosa,* 839 A.2d 519 (R.I.2003). In that case we held, "[t]he difference between first-and second-degree murder is the element of premeditation: first-degree murder 're- quires proof of premeditation of more than a momentary duration and proof of delib- eration * * *.' " *Id.* at 527 (quoting *Gra- bowski,* 644 A.2d at 1285). Again, deliber- ation was included merely as a way of describing the element of premeditation,

---

**21.** In *Gillespie,* 960 A.2d at 973, we quoted similar language inasmuch as we were reciting the jury instructions given by the trial justice at trial.

**22.** That language came primarily from a United States Supreme Court case interpreting a Virginia criminal code and a criminal law treatise, not Rhode Island precedent. *State v. Grabowski,* 644 A.2d 1282, 1285 (R.I.1994) (citing *Jackson v. Virginia,* 443 U.S. 307, 309, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law,* § 7.7(e) at 648 (2d ed.1986)).

**23.** Although subsequent decisions of this Court have referred to *Grabowski,* they do not give further attention to the term deliberation. *See State v. Brown,* 744 A.2d 831, 838 (R.I. 2000); *State v. Campbell,* 691 A.2d 564, 572 (R.I.1997).

the only distinguishing element between first-and second-degree murder.

In light of the foregoing, and viewing the jury instructions in their entirety, we are satisfied that they adequately informed the jury of the relevant law. The jury instructions accurately mirrored the case law of Rhode Island.

### b. Instructing on Lesser-Included Offenses

■ ■ The jury instructions did not include a separate charge of second-degree murder, which is a lesser-included offense of first-degree murder. A criminal defendant "is entitled to an instruction on a lesser-included offense when the evidence produced at trial justifies such an instruction." *State v. Gautier*, 950 A.2d 400, 414 (R.I.2008) (quoting *State v. Ruffner*, 911 A.2d 680, 685–86 (R.I.2006)). "In determining whether the evidence calls for a lesser-included-offense instruction, the trial justice should not weigh the credibility of the testimony; rather, he or she should consider whether, at the very least, some minimal evidence exists that, if credited by the jury, could support a conviction for the lesser-included offense." [24] *Id.* (quoting *State v. McGuy*, 841 A.2d 1109, 1112 (R.I. 2003)). This Court examines the record to ascertain whether "an actual and adequate dispute exists as to the distinguishing element between the lesser and greater offenses." *Ruffner*, 911 A.2d at 686 (quoting *State v. Garcia*, 883 A.2d 1131, 1137 (R.I. 2005)). If there is no evidence of such a dispute, the trial justice is not required to instruct the jury on the lesser-included offense. *Id.* This Court's review is *de novo*. *State v. Brown*, 898 A.2d 69, 84 (R.I.2006).

■ ■ The trial justice instructed the jury on first-degree murder only. In response to defendants' objection and request for a second-degree murder instruction, the trial justice explained his reasons for only instructing on first-degree murder: He reasoned that if the testimony of Samath Me was to be believed—that defendants were in the hallway with weapons and fired guns into the air before shooting at Khea's vehicle—then the evidence showed preparation, supporting either a first-degree murder conviction or no homicide conviction at all. The trial justice explained to counsel:

"I entertained the idea of charging second degree. * * * I have reviewed in my own mind and in my notes the testimony in this case, and I came to the conclusion that a second degree instruction is not applicable.

"Here's the reason why. If the evidence is to be believed, these two defendants, according to the witness, Samath Me, he testified that Mr. Sin and Mr. Ros were in that hallway with weapons on their laps. * * * There was testimony also in this case that these two defendants ran outside, fired the guns in the air, went back in, came out again, fired the guns in the air. And then the evidence, of course, is that both defendants ran out of that driveway and fired into that vehicle, of course, killing Mr. [Heang Ly Say] and paralyzing Mr. Ngim.

"* * * I came to the conclusion that the evidence in this case shows that

---

**24.** "The trial justice should give the jury a lesser-included offense instruction when the evidence so warrants because 'of the danger that, absent such an instruction, a jury may erroneously convict a criminal defendant of the principal offense charged, despite the prosecution's inability to prove an element of that offense, when the jury is convinced that the defendant's conduct was criminal.'" *State v. McGuy*, 841 A.2d 1109, 1112 n. 1 (R.I.2003) (quoting *State v. Rodriguez*, 822 A.2d 894, 910 (R.I.2003)).

these two defendants sat in preparation, if the evidence is to be believed, with these weapons. They ran into the back of the house and fired the weapons * * *. The conclusion I reach is that this [is] a first-degree murder case, and nothing else, and if it's not first degree, it's nothing else. That's my conclusion. Based upon the fact they ran from this driveway, followed that car up the road. It's a long time under the law for first-degree murder * * *. * * * For those reasons, the Court denies the request." We agree.

It is well established, as explicated in our recent decision in *Gillespie*, 960 A.2d at 974–77, that the difference between first-and second-degree murder in Rhode Island is that first-degree murder requires premeditation. As the trial justice noted, the evidence supported only a theory of an intent-to-kill that lasted for more than a moment's duration.

Moreover, there is no evidence in the record of "an actual and adequate dispute" at trial about the existence, or lack thereof, of the element of premeditation. *Ruffner*, 911 A.2d at 686. At trial, defendants relied almost exclusively on a theory of mis-identification because of police coercion and a lack of witness credibility. They attempted to prove that both defendants were intoxicated and in the house at the time of the shooting. On appeal they now argue that possession of guns and firing them into the air could be explained as celebratory activity on New Year's Eve, as opposed to evidence of premeditation. There was no testimony or argument at trial advancing or disputing this theory.

Without any real dispute at trial about whether these were sudden and impulsive as opposed to premeditated and pre-planned shootings, a second-degree murder instruction was not required. *See Ruffner*, 911 A.2d at 685–86. Accordingly, we perceive no error in the jury instructions on murder.

### 3. Conspiracy

The defendants submit that the jury instructions on the crime of conspiracy were erroneous in two ways. First, they assert that the trial justice erred by refusing to instruct the jury that in order to prove a conspiracy, the state must establish more than a defendant's mere association with participants in the crime or presence at the scene of a crime. Second, they argue that the trial justice erred by instructing the jury that, concerning the crime of conspiracy, it was required that identical verdicts be returned for or against both defendants. In so arguing, defendants challenge the viability of the rule of consistency and assert that the instruction violated defendants' constitutional rights to due process of law. The state responds that, concerning the first alleged error, the jury instructions, when examined as a whole, were comprehensive and adequately informed the jury of the relevant law. Additionally, the state argues that this Court need not address the rule of consistency in this case because neither defendant was acquitted of conspiracy. Alternatively, the state maintains that case precedent supports the adequacy of the instruction given.[25]

---

25. The trial justice instructed the jury, in pertinent part, as follows:

"Count 2, conspiracy. Generally speaking, and in the context of this case, a conspiracy is a combination of two or more persons to commit an unlawful act. A conspiracy is, in effect, a partnership in a crim-inal venture. Once the unlawful agreement has been made, the crime of conspiracy is complete.

"The law provides that every person who conspires with another to commit a crime has thereby committed a separate criminal offense. In other words, the law provides

### a. Mere Association and Presence

The defendants argue that the trial justice erred by not including a requested jury instruction that defense counsel offered. Both defendants requested that the trial justice instruct the jury that the mere association of participants in a crime, or mere presence at the scene of a crime, is insufficient to establish proof of the existence of a conspiracy. The trial justice included a similar charge in the written jury instructions he gave to counsel in advance of his charge. However, the trial justice omitted this instruction during the actual charge to the jury, stating that the state had convinced him that such an instruction is appropriate when a defendant is charged under an aiding-and-abetting theory of criminal liability, but not for a charge of conspiracy.

■■■■ We do not doubt the legal accuracy of defendants' proposed instructions, being that the essence of the crime of conspiracy is an unlawful agreement. *See Graham*, 941 A.2d at 863 (proof beyond a reasonable doubt of an agreement between two or more persons to commit an unlawful act, or to perform a lawful act for an unlawful purpose, is all that is required for a conspiracy conviction); *State v. Disla*, 874 A.2d 190, 197 (R.I.2005) ("[o]nce an agreement has been made, no further action in furtherance of the conspiracy is necessary to find a defendant guilty of the crime of conspiracy") (quoting *State v. Lassiter*, 836 A.2d 1096, 1104 (R.I.2003)).

that if two or more persons conspire to commit a substantive criminal act, such as murder, each person is also guilty of the separate offense of conspiracy. It is important to remember that conspiracy is, by itself, a separate and distinct offense from the substantive offense of murder, which is the object of the alleged conspiracy.

"Since by its nature the crime of conspiracy requires a combination of, and an agreement between two or more persons, you are instructed, as to Count 2 only, to either convict Arun Ros and Veasna Sin of conspiracy or to acquit Arun Ros and Veasna Sin of the crime of conspiracy. You cannot convict one defendant and acquit the other.

"In order to convict the defendants of the conspiracy charge, the State must prove beyond a reasonable doubt that there was an agreement between Veasna Sin and Arun Ros to commit murder. Although a common agreement is the keystone of any criminal conspiracy, the terms of such an agreement are often difficult to prove. Consequently, the conspirators' goals may be inferentially established by proof of the relations, conduct, circumstances and actions of the parties.

"The evidence in the case need not show that members of a conspiracy entered into any express contract or formal agreement, or that they directly, or by word spoken or in writing, stated between themselves what the object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished. What the evidence must show is that Veasna Sin and Arun Ros, in some manner, came to a mutual understanding to try to accomplish a common and unlawful plan, in this case murder.

"The existence of a conspiracy may be proved by direct evidence or entirely by circumstantial evidence, or by any combination of both.

"Because a conspiracy is a kind of partnership in crime, each member of the conspiracy becomes the agent of every other member. A person who willfully enters into a conspiracy is, therefore, charged with the same criminal responsibility for the action of any other member of the conspiracy if those actions are taken in furtherance of that common design or plan. Similarly, the declarations and statements of one co-conspirator, which were made during the course of a conspiracy and in furtherance of it, are likewise admissible against the other members of the conspiracy. In other words, each member of a conspiracy is vicariously responsible for every act done by a co-conspirator in carrying out the plan, as one of its natural and probable or foreseeable consequences, even though the act may not have been part of the original plan, or even if it was forbidden by one or more of the co-conspirators."

Nonetheless, defendants' argument that a specific statement be included in the jury instructions is contrary to our oft-repeated standard of review that the jury instructions be examined as a whole and affirmed as long as they adequately explain the law to the jury. *See Graham,* 941 A.2d at 855; *Ibrahim,* 862 A.2d at 795–96. The trial justice was correct in his assertion that the case law in Rhode Island uses the language of mere presence and association when a defendant is charged with aiding and abetting the commission of a crime. *See State v. Eddy,* 519 A.2d 1137, 1143 (R.I.1987); *State v. Gazerro,* 420 A.2d 816, 828 (R.I.1980). The defendants acknowledge that they were unable to find a Rhode Island case using similar language in the context of a conspiracy charge. *But see State v. Romano,* 456 A.2d 746, 757 (R.I.1983). In light of the foregoing, we conclude that the trial justice's instructions adequately informed, and did not mislead, the jury of the relevant law. There was no error in this regard.

### b. Rule of Consistency

The trial justice charged the jury that it could not convict one defendant and acquit the other of the charge of conspiracy. Specifically, the trial justice told the jury:

"Since by its nature the crime of conspiracy requires a combination of, and an agreement between two or more persons, you are instructed, as to Count 2 only, to either convict Arun Ros and Veasna Sin of conspiracy or to acquit Arun Ros and Veasna Sin of the crime of conspiracy. You cannot convict one defendant and acquit the other."

The verdict form given to the jury reinforced this instruction; it contained the following note with regard to the conspiracy count: "Note: On this [c]ount your verdict must either acquit both defendants or convict both defendants. You cannot convict one defendant and acquit the other." The defendants acknowledge that elsewhere in the instructions the trial justice stated otherwise: "[Y]ou must give separate consideration and render separate verdicts with respect to each defendant as to each count." In fact, the trial justice repeated this standard instruction to the jury on at least three occasions. The court also told the jury, "the guilt or innocence of one defendant of any of the crimes charged should not control or influence your verdicts as to the other defendant, or any of the offenses charged to him."

■ As we stated earlier, the crime of conspiracy is an agreement between *two or more* persons to commit an unlawful act or to perform a lawful act for an unlawful purpose. *Graham,* 941 A.2d at 863. In Rhode Island, the rule of consistency provides that "one defendant in a prosecution for conspiracy cannot be convicted when all of his alleged coconspirators, be they one or more, have been acquitted or been discharged under circumstances which amount to an acquittal." *State v. Reis,* 815 A.2d 57, 64 (R.I.2003) (quoting *State v. Fontaine,* 113 R.I. 557, 558–59, 323 A.2d 571, 572 (1974)). We follow this rule because "the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all." *Id.* at 64 n. 5 (citing *United States v. Bucuvalas,* 909 F.2d 593, 594 (1st Cir. 1990)).

■ Generally, the rule of consistency is exercised by the trial court. Usually, the rule is applied post-verdict by the trial justice when and if the jury returns legally inconsistent verdicts and before the court enters judgment. *See, e.g., State v. Payette,* 557 A.2d 72, 73 (R.I.1989). The

defendants argue in this case that the trial justice improperly delegated the rule of consistency to the jurors by instructing them that they could not convict one defendant and acquit the other. We caution the trial court against this practice. This is not a proper exercise of the rule of consistency. It is within the province of the jury to return inconsistent verdicts. *See State v. Verrecchia*, 766 A.2d 377, 387 (R.I.2001) ("a jury must be afforded broad power to arrive at inconsistent verdicts of acquittal and conviction through its traditional power to compromise, whether the compromise reached is motivated by a desire to show leniency or by some other consideration") (quoting *Romano*, 456 A.2d at 764). Moreover, such an instruction might frustrate the jury's task of independent judgment vis-à-vis each defendant.

. ■ Nonetheless, we conclude that the trial justice did not commit reversible, prejudicial error in instructing the jury on conspiracy in this case. The instructions properly enumerated the elements of the crime of conspiracy. They also adequately explained the theory of coconspirator or vicarious liability. Although we are of the opinion that the jury should not be instructed that it must find two or more alleged coconspirators both guilty or both not guilty, "this Court will not examine a single sentence apart from the rest of the instructions." *Ibrahim*, 862 A.2d at 796 (quoting *State v. Kittell*, 847 A.2d 845, 849 (R.I.2004)). Instead, we examine the challenged portions in the context of the whole. *See id.* Here, the trial justice's instructions to the jury stated on numerous occasions that the jury was required to give separate consideration for each defendant and each charge. The trial justice explained that a verdict concerning one defendant should not dictate the jury's determination as to the other defendant. The above affirmations cured any misplaced

delegation of the rule of consistency. We are satisfied that, from these instructions, taken as a whole, the jury could not have returned two guilty conspiracy verdicts if it was not convinced, beyond a reasonable doubt, that both defendants were guilty of this crime. We perceive no prejudicial error.

### 4. Assault with Intent to Commit Murder

Ros alleges error in the trial justice's refusal, with respect to the charge of assault with intent to commit murder, to instruct the jurors that they were required to consider each count against each defendant separately. He argues that the absence of such an instruction with respect to this count, coupled with the presence of such an instruction for the four counts of assault with a dangerous weapon, may have led jurors to infer that the instruction did not apply to this crime. Additionally, Ros submits that the issue of separate consideration of each defendant and each charge already was confounded by the conspiracy instruction requiring identical verdicts.

In our opinion, the jury instructions, examined as a whole, adequately informed the jurors that they were required to consider each count against each defendant independently. The trial justice reminded the jury of this duty no fewer than three times. The absence of this specific instruction from the instruction on this specific crime could not have misled the jurors. With respect to Ros's argument that the conspiracy instruction already complicated this task, we rely on our discussion, *supra.* We perceive no error.

### 5. Discharging a Weapon While Committing a Crime of Violence

Ros argues that the jury instructions on the counts of discharging a weapon while

committing a crime of violence were erroneous on two grounds. First, he incorporates his argument on the motion for judgment of acquittal on these counts, maintaining that the trial justice should not have instructed the jury on this charge because the state was unable to present sufficient evidence that Ros was involved in the shootings. Second, Ros argues that the trial justice erred by not including Ros's requested instruction, which emphasized that defendant could not be found vicariously liable for this offense. In light of our discussion of the sufficiency of the evidence and *Pinkerton* liability, *supra*, we hold that the trial justice committed no error in his instructions on these counts.

## C

### Read–Back of Trial Transcript

The defendants argue that the trial justice committed reversible error by permitting the stenographer to read back to the jury significantly more testimony of Samath Me than the jury had requested. Furthermore, defendants find fault in the trial justice's refusal to supplement the read-back with another witness's testimony, at the request of defendants. The defendants argue that the extent of the testimony read back to the jury was not responsive to its inquiry, was lacking in fairness and impartiality, and was prejudicial to defendants. The state contends that it is not apparent from the record exactly which portions of Samath Me's testimony were read back to the jury and that this inadequacy prevents this Court from reviewing this issue in any "meaningful" way. The state argues, in the alterna-

tive, that, if review is possible, defendants have not demonstrated that the read-back was overly broad or, even if it was, how the read-back was prejudicial to them.

During deliberations, the jury specifically requested a read-back of Samath Me's "testimony relative to when he saw the defendants or defendants with firearms in the hallway," stating that this request was prompted by the amount of time that had passed since the jurors had heard the testimony. The trial justice, according to this request, had the stenographer read back to the jury the testimony of Samath Me "concerning the defendant or defendants with firearms in the hallway." From the record, it appears that the trial justice had the stenographer read both the direct and cross-examinations of those portions of Me's testimony, "out of fairness." [26] It is unclear, however, which questions and answers the stenographer reread to the jury, the context of those questions and answers, or the extent of the testimony that was reread. The record before us in this regard consists of defendants' objection to the read-back, which recounts those parts of the read-back that counsel argued were nonresponsive to the jurors' inquiry.[27] Specifically, defendants objected to the following testimony being read back to the jury: seeing a Tech 9 in the hallway of Pheurt Phann's residence; knowledge about guns from video games, movies and magazines; the fact that Me wears glasses; Me's unemployment; his admission that he "basically has no bearing on times"; and information about Rocky Sok. The trial justice overruled the objection, finding "that the testimony regarding the weapons and other matters * * * were all

---

26. "THE COURT: [The stenographer] is going to read the direct examination of those portions, and also, out of fairness, the cross-examination of the defense attorneys regarding that area that you requested."

27. At this juncture, defendants did not move to pass the case.

relevant to the issue requested by the jury." The trial justice also denied defendants' request that the court read back to the jury Det. Sweeney's testimony because the jury did not request this testimony.

### 1. Standard of Review

■ The decision whether to read back to the jury a particular witness's trial testimony—in response to a jury request—"is committed to the sound discretion of the trial justice." *State v. Dumas*, 835 A.2d 438, 443 (R.I.2003) (citing *State v. Pierce*, 689 A.2d 1030, 1035 (R.I.1997) and *State v. Dame*, 488 A.2d 418, 422 (R.I. 1985)); *see Stone v. United States*, 506 F.2d 561, 564 (8th Cir.1974). The trial justice generally should honor such a request, "especially when it is practically possible to do so without consuming an inordinate amount of time and without misleading the jury." *Dumas*, 835 A.2d at 443; *see State v. Haigh*, 666 A.2d 803, 804 (R.I.1995). A read-back must be fair and impartial and must not invade the province of the jury to determine the facts of the case. *Pierce*, 689 A.2d at 1035.

### 2. Analysis

Normally, when a case presents a challenge based on testimony read back to the jury per its request, the issue is one of under-inclusion: one party is arguing that the read-back was lacking in impartiality because of an omission or incompleteness. We have held that for a read-back to be fair and impartial, it should include all testimony pertaining to the subject matter of the jury request. *Dumas*, 835 A.2d at 444; *State v. Burke*, 529 A.2d 621, 629 (R.I.1987). These decisions commonly have concerned the prejudicial omission of cross-examination testimony. *See Dumas*, 835 A.2d at 444 ("[i]f the testimony elicited on cross-examination goes directly to the subject matter of the questions asked on direct and is crucial to the determination

of the defendant's guilt or innocence, then it should be re-read to the jury together with the testimony"); *Pierce*, 689 A.2d at 1035 (trial justice's omission of arguably crucial portions of cross-examination testimony constituted prejudicial error); *Dame*, 488 A.2d at 423 (trial justice erred in reading to the jury only direct examination testimony when the cross-examination testimony related to the subject matter of the jury question).

This case is exceptional in that defendants are arguing that the read-back was over-inclusive and nonresponsive—that the stenographer read *too much* testimony to the jury. The defendants' argument is doubly unique in its assertion that the trial justice should have balanced this read-back with the testimony of *another* witness in order to avoid placing undue emphasis on the witness testimony specifically requested by the jury.

■ When a jury makes a request for information, the response should be tailored to the request. *Dumas*, 835 A.2d at 443. The trial justice has considerable discretion in how to respond to a request. *See id.* at 443–45. We discern no abuse of discretion on the part of the trial justice or prejudice to defendants in this case. The trial justice instructed the stenographer to read both the direct and cross-examination testimony of Samath Me relative to his observing defendants in the hallway with firearms, a practice clearly ordained, if not demanded, by precedent.

Moreover, there never has been a requirement that the trial justice supplement the read-back with other witnesses' testimony. Not only would this go beyond the jury's request, it would demand that the court scour the record of every case to ferret out all the testimony that arguably could make a response seem fair and impartial. This could result in a slippery

slope, allowing counsel to request more and more potentially pertinent information for the response. It is also contrary to case law that condones the omission of certain testimony from a read-back if the jury had ample opportunity to hear about it from other witnesses. *See Dumas*, 835 A.2d at 444 ("when, as here, the effect of the cross-examination has not been to undermine the direct testimony, and the jury has heard other evidence on this same subject from other witnesses, then any error by the court in limiting the re-reading only to the direct examination would amount, at worst, to harmless error"); *State v. Gomes*, 604 A.2d 1249, 1259–60 (R.I.1992) (omitted testimony had negligible prejudicial effect because it was presented through other witnesses and the jurors could have requested more information).

Admittedly, it is difficult for us to meaningfully review this issue because the record does not reflect exactly what portions of the trial transcript were read back. *See State v. Drew*, 919 A.2d 397, 403 n. 5 (R.I.2007) (where the transcript did not include the content of the testimony actually read back to the jury, the defendant withdrew his argument because he did not have an adequate record with which to proceed). From the record in this case, however, we know that the examination of Samath Me was relatively haphazard and disorderly. We understand that tangential information is commonly so inextricably interwoven into relevant trial testimony that excising that information would be logistically difficult for the court and might disconcert the jurors. Even so, on the scant record before us, we do not question the reasonableness of the trial justice's decision that the testimony to which defendants objected was relevant to the jurors' request.

### D

### Constitutionality of Jury Composition

Lastly, defendants challenge Rhode Island's system of selecting grand and petit juries, arguing that it effectuates unconstitutional jury composition in violation of the Sixth and Fourteenth Amendments to the United States Constitution, as well as the Rhode Island Constitution, and federal and state statutes. Specifically, defendants seek dismissal of their indictments on the ground that the juror selection process in Rhode Island impermissibly results in the exclusion of minorities and residents of the urban communities of Providence, Central Falls, and Pawtucket. The state argues that Rhode Island's method of selecting jurors is constitutional. The state maintains initially, however, that, as a threshold matter, this issue lacks justiciability after this Court's recent decision of *State v. Beechum*, 933 A.2d 687 (R.I.2007).

On October 25, 2004, defendant Ros moved to dismiss the indictment against him, in which motion defendant Sin joined, based on the arguments presented, argued and decided in *State v. Tremblay*, 2003 WL 23018762 (R.I.Super.Mar.19, 2003), a Superior Court case that was not appealed. The parties and trial justice agreed that, because the identical issue—the constitutionality of jury composition in Rhode Island—recently had been litigated in *Tremblay*, it would not be re-litigated in this case, presumably to save time and avoid duplicative effort. Instead, the parties agreed to adopt the record that was before the Superior Court in *Tremblay*, including the parties' pleadings, memoranda of law, and experts' affidavits. These were incorporated into this case as exhibits. The trial justice, likewise, adopted the decision reached by the trial justice in *Tremblay*, thereby denying the motion to dismiss the

indictments.[28] There was no argument or further discussion of this issue at trial. In light of this procedural posture, we decline to address the merits of this issue on appeal.

In the time passing between the motion to dismiss the indictment against defendants and this appeal, this Court decided *Beechum,* erecting a procedural bar to our consideration of defendants' challenge to the jury selection process. In *Beechum,* 933 A.2d at 690, we held that the method that the parties used in this case—incorporating the arguments, issues and ultimate decision on the issue of jury selection from another trial court case—is not a proper method of presenting this important constitutional matter.[29] *See also State v. Lead Industries Association, Inc.,* 898 A.2d 1234, 1239 (R.I.2006) (a "policy favoring the hasty review of constitutional questions would be ill-advised").

 The defendants maintain that, "in this case, the record was created by incorporating the record from another proceeding." We, however, would be especially troubled to reach an issue of this magnitude in a case, such as here, in which the trial court record contains absolutely no documentation or evidence *from this case* about the actual jury selection system em-

ployed, the composition of the jury pool, the voir dire process that transpired below, or the final composition of the petit jury. Moreover, Sin indicates in his brief that since we decided *Tremblay,* Rhode Island has changed its jury selection process. It is unclear from the defendants' briefs or from the record—which is entirely devoid of facts regarding jury selection for the defendants' trial—whether this change was enacted before or after the jury was selected at their joint trial, giving us even more reason for hesitation.[30] Accordingly, we conclude that the defendants have not presented this Court with a proper issue for appeal.

## III

## Conclusion

For the reasons set forth in this opinion, we affirm the judgments of conviction in all respects. The papers shall be remanded to the Superior Court.

---

28. Technically, the parties and trial justice adopted the Superior Court record, documents, and decision from both *State v. Tremblay,* 2003 WL 23018762 (R.I.Super.Mar.19, 2003), and *State v. Beechum,* 933 A.2d 687 (R.I.2007). The parties and trial justice in *Beechum,* 933 A.2d at 688, however, merely incorporated the record, documents, and decision from *Tremblay* on the constitutional issue of jury composition and did not produce or assert any novel arguments or evidence of their own.

29. In *Beechum,* 933 A.2d at 690, the defendant had not presented a justiciable issue on appeal. His constitutional challenge to jury composition did not involve a present case or controversy because the defendant had decid-

ed to waive his right to a jury trial and submit to a bench trial based on stipulated facts. *Id.* at 688–89. This Court held that he could not overcome this defect by incorporating the record from the previous Superior Court case of *Tremblay. Beechum,* 933 A.2d at 690.

30. Indeed, in *Beechum,* which was tried over a year before this case, the state and the defendant agreed and informed the trial court that the selection of the grand jury and petit jury in both *Beechum* and *Tremblay* occurred within the same period of time. Apparently, these two cases were "basically traveling through the system [together]." No such agreement or assertion was made in this case.